# STATE OF CONNECTICUT *v.* ROBERTO MORALES
## (11565)

Foti, Lavery and Heiman, Js.

Submitted September 7—decision released October 31, 1995

*Temmy Ann Pieszak*, assistant public defender, for the appellant (defendant).

*Donald A. Browne*, state's attorney, with whom, on the brief, was *John Smriga*, assistant state's attorney, for the appellee (state).

HEIMAN, J. This matter is before us on remand from our Supreme Court. *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995). The defendant originally appealed to this court from the judgment of conviction, rendered after a trial to the court, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1),[1] robbery in the first degree in violation of General Statutes § 53a-134 (a) (3),[2] and threatening in violation of General Statutes § 53a-62 (a) (1).[3]

In his original appeal to us, the defendant asserted that (1) the trial court improperly denied his motion to dismiss for lack of a speedy trial, (2) he was deprived of his right to due process and a fair trial under the state constitution by the unavailability of exculpatory evidence, and (3) he was deprived of his right to due

---

[1] General Statutes § 53a-70 provides in pertinent part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-134 provides in pertinent part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (3) uses or threatens the use of a dangerous instrument . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] General Statutes § 53a-62 provides in pertinent part: "(a) A person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ."

process by the prosecution's use of evidence from a previous plea bargain that was withdrawn. *State* v. *Morales*, 33 Conn. App. 184, 186, 634 A.2d 1193 (1993). We resolved all of the issues raised by the appeal and affirmed the judgment of the trial court.

Our Supreme Court granted certification limited to the following issues concerning the defendant's claim that his right to due process was violated by the unavailability of potentially exculpatory evidence:

"1. Did the Appellate Court properly conclude that under the circumstances of this case, the proper test for ruling on the defendant's motion to dismiss, under article first, § 8, of the Connecticut constitution, was the test articulated in *Arizona* v. *Youngblood*, [488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)]?

"2. If the answer to question (1) is yes, did the Appellate Court properly conclude, under the circumstances of this case, that: (a) a motion to dismiss was a proper remedy for the alleged failure of the state to preserve potentially exculpatory evidence; and (b) a different standard would apply to a motion to suppress evidence based on the same conduct of the state?" *State* v. *Morales*, 228 Conn. 928, 640 A.2d 116 (1994).

In answering those questions, our Supreme Court rejected our adherence to "the litmus test of bad faith on the part of the police, which the United States Supreme Court adopted under the federal constitution in *Youngblood*." *State* v. *Morales*, supra, 232 Conn. 726. In lieu of that test, our Supreme Court held that "in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman* balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including

the following factors: 'the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Asherman,* [193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U. S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]." *State* v. *Morales,* supra, 232 Conn. 726–27.

Because we followed *Youngblood,* we did not, in the original appeal, address the claim of the defendant that the trial court had imperfectly applied the *Asherman* balancing test. Accordingly, having determined the proper test, the Supreme Court remanded the matter to us to determine whether the trial court properly applied the balancing test. Id., 730.

"The trial court could reasonably have found the following facts. On December 30, 1990, the victim was at the Pembroke Grill on Pembroke Street in Bridgeport. She left the grill at approximately 11:45 p.m., walked down Pembroke Street and turned left onto East Main Street. While on East Main Street, she heard someone following her. She stopped at a phone booth and was approached by the defendant. The defendant, who had a Spanish accent, asked if she was calling the police. She said no and pretended to call her boyfriend. A person in a tow truck then pulled up next to the phone booth. The victim asked the driver to give her a ride because she believed the defendant was going to hurt her, but he refused, stating that the defendant was his relative. The driver and the defendant then began to talk to each other. Meanwhile, the victim began to walk down Seymour Street toward Kossuth Street. On Seymour Street, she again saw the defendant following her. She walked down Kossuth Street toward the thruway. When the victim reached an Interstate 95 underpass, the defendant grabbed her and punched her in the mouth. He then pulled out a knife, placed it at her neck

and pulled her beneath the underpass and through a gate. The defendant pushed the victim down on her knees, told her not to move or say anything and to keep her head down or he would kill her. The defendant dropped the knife and told the victim to unbutton and unzip her pants. The defendant then pulled off her pants and underwear, got behind her and, while holding her around the neck, bit her 'on [the] butt.' The defendant then 'put his thing in [her] butt.' He bit her neck and jumped off of her while telling her to keep her head down or he would kill her, and he 'wiped his penis off on [the victim's] jacket.' The defendant then pulled off her necklaces and bracelet and walked away. The victim then walked down Stratford Avenue and stopped a car that she recognized as belonging to a friend. The friend drove the victim to the Bridgeport police station. The police called an ambulance that transported the victim to Park City Hospital for treatment. After treatment, she gave a statement to Detective Annie Osika about the incident and turned over her jacket to the police.

"In the spring of 1991, while a passenger on a bus, the victim saw the defendant standing on the corner of Stratford Avenue and East Main Street. She stayed on the bus for a few stops, then disembarked and called the police. The police transported the victim back to where she had seen the defendant. She identified him as her attacker, and he was arrested on March 11, 1991." *State* v. *Morales*, supra, 33 Conn. App. 186–87.

"On May 22, 1991, the trial court granted the defendant's motion for discovery and inspection of certain items. The motion requested the disclosure of 'exculpatory information and materials.' The jacket was unavailable at trial because the Bridgeport police had returned it to the victim prior to the defendant's arrest." Id., 191. At trial, the defendant moved to dismiss the charges against him because the Bridgeport police department had failed to preserve the victim's jacket as evidence.

The trial court denied the defendant's motion to dismiss.

The defendant claims that his right to due process was violated because of the unavailability of the victim's jacket and, therefore, that his motion to dismiss should have been granted. In determining whether the defendant has been afforded due process of law under our state constitution, the trial court was required to apply the *Asherman* balancing test. *State* v. *Morales*, supra, 232 Conn. 727. "In this case, the record is clear that the trial court, in deciding the defendant's motion to dismiss, attempted to apply a balancing test quite similar to the [*Asherman* test]."[4] Id., 730. In his appeal to this court, the defendant argues that, although the trial court applied a balancing test, it did not apply that test correctly. Thus, in order to determine whether the defendant's right to due process has been violated, it is our task to review the trial court's application of the *Asherman* balancing test in its denial of the defendant's motion to dismiss. See id.

We begin our analysis by defining our scope of review. "Facts found by the trial court will not be disturbed unless the finding is clearly erroneous. Practice Book § 4061; *State* v. *Torres*, 197 Conn. 620, 625, 500 A.2d 1299 (1985). Conclusions drawn from those underlying facts must be legal and logical. *State* v. *Lasher*, 190 Conn. 259, 267, 460 A.2d 970 (1983)." *State* v. *Geisler*, 222 Conn. 672, 693, 610 A.2d 1225 (1992). Where the trial court examines an underlying set of facts and draws a legal conclusion from those facts, that legal

---

[4] We note that the trial court cited the balancing test set forth in *State* v. *Leroux*, 18 Conn. App. 223, 230–31, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989), as the basis for its denial of the defendant's motion to dismiss. The test set forth in *Leroux* is identical to the test set forth in *Asherman*. Our Supreme Court, however, has denominated the balancing test as "the *Asherman* test"; *State* v. *Morales*, supra, 232 Conn. 720; and we will do the same.

conclusion is subject to plenary review by an appellate court. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 14, 664 A.2d 719 (1995); *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995); *State* v. *Torres*, 230 Conn. 372, 379, 645 A.2d 529 (1994).

Here, the trial court examined the underlying facts and applied the *Asherman* balancing test in ruling on the defendant's motion to dismiss.[5] "[W]hether those facts constituted a violation of the [defendant's right to due process] is a mixed determination of law and fact that requires the application of legal principles to the historical facts of the case. . . . Whether the historical facts as found by the [trial] court constituted a violation of the [defendant's right to due process] is subject to plenary review by this court, unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Davis* v. *Warden*, 32 Conn. App. 296, 301, 629 A.2d 440, cert. denied, 227 Conn. 924, 632 A.2d 701 (1993); see also *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152–53, 662 A.2d 718 (1995). In our examination of the facts and the record in this case, we find that the trial court properly applied the *Asherman* balancing test in denying the defendant's motion to dismiss.

With regard to the first *Asherman* factor, namely, the materiality of the potentially exculpatory evidence, our courts have held that " '[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *State* v. *Baldwin*, 224 Conn. 347, 365, 618 A.2d 513 (1993), quoting *United States* v. *Bagley*, 473 U.S. 667, 681–82, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).[6] Here, we do not find that such

---

[5] See footnote 4.

[6] In *Baldwin*, our Supreme Court used this definition of materiality in applying the *Asherman* balancing test to the question of whether the trial

a reasonable probability exists. The trial court found, and we agree, that it is purely speculative whether scientific tests could have been effectively performed on the jacket had it been recovered, and even if such tests could have been performed, whether such tests would have produced scientifically useful evidence. See *State v. Asherman*, supra, 193 Conn. 726; *State v. Leroux*, 18 Conn. App. 223, 234–35, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989). Even if we assume that the perpetrator wiped his penis on the victim's jacket after he assaulted her, we are left to speculate as to whether the jacket became stained, whether the stain would have indicated semen or some other substance, whether the substance would have been uncontaminated and sufficient in amount to conduct scientific testing, and whether the testing would have been effective to demonstrate that the defendant could not have been the perpetrator.[7]

court properly admitted testimony concerning lost evidence. *State v. Baldwin*, supra, 224 Conn. 365. The *Asherman* balancing test has been used by our courts in considering whether testimony concerning lost or destroyed evidence should be admitted; *State v. Marra*, 222 Conn. 506, 516, 610 A.2d 1113 (1992); *State v. McIver*, 201 Conn. 559, 565, 518 A.2d 1368 (1986); *State v. Boucino*, 199 Conn. 207, 229, 506 A.2d 125 (1986); *State v. Hamele*, 188 Conn. 372, 381, 449 A.2d 1020 (1982); as well as in considering whether the underlying prosecution should be dismissed due to the loss or destruction of evidence. *State v. Gonzalez*, 206 Conn. 213, 224, 537 A.2d 460 (1988); *State v. Harden*, 175 Conn. 315, 326–27, 398 A.2d 1169 (1978); *State v. Grillo*, 23 Conn. App. 50, 55–56, 578 A.2d 677 (1990); *State v. Leroux*, 18 Conn. App. 223, 230–31, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989).

[7] The victim's statements to the police and at trial do not support the contention that a fully testable amount of semen existed on the victim's jacket after the assault. In the victim's statement to the police, which was entered as a full exhibit at trial, she stated that the defendant ejaculated "in my ass," and that after he finished assaulting her he "wiped his dick on my coat." The victim did not indicate to the police that any amount of ejaculate remained on the defendant's penis when he wiped it on her jacket, nor did she describe the nature of the substance, if any, that the defendant wiped on her jacket, or whether such substance originated from his body or from her body. On direct examination, the victim merely indicated that the defendant penetrated her "butt" with his penis, bit her neck, jumped

In further examining the materiality of potentially exculpatory evidence under the *Asherman* test, a critical factor that our courts have considered is the defendant's lack of interest in the evidence. *State* v. *Baldwin*, supra, 224 Conn. 365; see also *State* v. *Harden*, 175 Conn. 315, 327, 398 A.2d 1169 (1978). "The fact that a defendant failed to request the evidence goes to the issue of materiality and whether the defendant deemed it significant." *State* v. *Morales*, supra, 232 Conn. 712 n.7. The trial court found, and we agree, that the defendant's lack of interest in the jacket prior to his motion to dismiss is quite remarkable. "The defendant's counsel conceded that [prior to trial] both he and prior defense counsel knew then of the existence of potential semen stains, but failed to ask specifically that the police produce the jacket." Id., 712. "The police returned the jacket to the victim on February 13, 1991, approximately one month before the defendant was arrested on March 11, 1991. A public defender was appointed to represent the defendant at his arraignment on that day. The defendant, however, did not take any procedural step specifically regarding the jacket until he moved to dis-

---

off of her and told her to keep her head down and not move or he would come back and kill her. She made no mention at all on direct examination as to whether the victim ejaculated in her anus or whether he wiped his penis on her jacket. On cross-examination, the victim equivocated as to the nature of the substance the defendant wiped on her jacket. The following colloquy took place at trial on cross-examination:

"[Defense Counsel]: The sex that you say that he forced upon you, you're saying he did it in your backside, your anus?

"[Victim]: Yes.

"Q. Did he have sex with you either in your mouth or your vagina?

"A. No.

"Q. You indicated that when he finished—do you know if he came or not?

"A. Yes. Well, right before he got off me he bit me on my neck, so I figured he was finished. And then he wiped his penis off on my jacket.

"Q. You don't know for certain, then, whether he came or not?

"A. Yes, I do. It was all over my jacket.

"Q. Well, *something* was all over your jacket?

"A. Yes."

miss the state's case at the end of the state's presentation of evidence at trial on April 27, 1992, more than one year later. Thus, although the state is properly faulted for returning the jacket to the victim, the defendant is not entirely without fault. It is at least possible that, had the defendant asked for the return of the jacket for testing as early as March, 1991, when the defendant was arrested and counsel was appointed to represent him, or, at the latest, in February, 1992, when his special public defender was appointed, the jacket could then have been retrieved from the victim." Id., 734–35 (*Borden, J.*, concurring).

The second *Asherman* factor we must consider is "the likelihood of mistaken interpretation of [the missing evidence] by witnesses or the [trier of fact]." *State* v. *Asherman*, supra, 193 Conn. 724. In examining this factor, it is of great significance that the case was tried to the court as opposed to a jury. We find this factor to weigh heavily against the defendant. "This is especially true in light of the fact that the trial was before [the court] and not before a jury, which decreased the likelihood that the trier of fact would draw an improper inference from the evidence or the lack of evidence." *State* v. *Ricketts*, 37 Conn. App. 749, 762, 659 A.2d 188, cert. denied, 234 Conn. 913, 660 A.2d 355 (1995). Thus, the possibility that the court, as trier of fact, misinterpreted the missing evidence in this case is minimal.

In balancing the third *Asherman* factor, "the reason for the unavailability of the evidence, our cases have focused on the motives behind the destruction of the evidence." *State* v. *Leroux*, supra, 18 Conn. App. 231. In examining such motives, "our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless

disregard of the defendant's rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Grillo*, 23 Conn. App. 50, 56, 578 A.2d 677 (1990). Here, the circumstances concerning the loss of the jacket are as follows. "Sometime early in 1991, the victim, who did not have another winter jacket, sought to have the police return the jacket they had seized. The police, after repeated requests from the victim, finally returned her jacket on February 13, 1991, some six weeks after she had been attacked." *State* v. *Morales*, supra, 232 Conn. 711. This was almost one month before the defendant was arrested on March 11, 1991. In considering the previously stated facts, the trial court found, and we agree, that while the police department may have been negligent in returning the jacket to the victim, there was certainly no evidence of bad faith or an intention to harm the potential defendant in the case, let alone this defendant. In fact, at trial, "[t]he defendant did not argue that the police, in returning the jacket to the victim, had acted in bad faith or that they had any motive for doing so other than accommodating the victim." Id., 712. Thus, the trial court properly found that the reason for the unavailability of the jacket did not significantly tip the *Asherman* scale in favor of the defendant.

In further examining the third *Asherman* factor, we emphasize that when the evidence at issue was destroyed, the case was only in its investigatory stage. *State* v. *Leroux*, supra, 18 Conn. App. 232. At the time the police returned the jacket to the victim, and " 'thus negligently lost potentially valuable evidence, they had at least as great an interest in preserving the evidence as did the person later accused of the crime. Indeed, at that time it was more likely that the evidence would have been useful to the police—who were still conducting an investigation—and to the prosecutor—who would later bear the burden of establishing guilt beyond a reasonable doubt—than to the defendant. In cases

such as this . . . the State has a strong incentive to preserve the evidence.' At the least, therefore, courts should be very cautious in dismissing a case where no more than police negligence led to the loss or destruction of evidence during the investigatory phase, because as a matter of policy there is slight need for such a severe sanction." Id., 232, quoting *Arizona* v. *Youngblood,* supra, 488 U.S. 59.

Finally, we must consider the fourth *Asherman* factor, the prejudice to the defendant caused by the unavailability of the evidence. "In a case such as this, where the crucial issue for which the evidence would have been offered was the identity of the assailant, the court must weigh the factors in that light. If, for example, the evidence could have been tested to demonstrate immutable characteristics of the assailant, then the prejudice factor would weigh heavily in favor of the defendant." *State* v. *Morales,* supra, 232 Conn. 727. As we have already stated, however, we are left only to speculate as to whether the jacket could have been beneficial to the defendant's case. "[I]t is pure speculation whether . . . testing of the [jacket] would have yielded exculpatory evidence." *State* v. *Leroux,* supra, 18 Conn. App. 234–35.

"In [further] measuring the degree of prejudice to an accused caused by the unavailability of evidence [under *Asherman*], the trial court properly may evaluate the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." *State* v. *Morales,* supra, 232 Conn. 727 n.22. Here, the trial court, as finder of facts, was aware of the underlying strengths and weaknesses of each side's case, and was fully able to assess the potential prejudicial effect of the unavailability of the jacket. In examining the potential prejudice to the defendant, the trial court had before it the following. "The only evidence linking the defendant to the crimes charged was the

testimony of the victim identifying him as her assailant. According to that testimony, she had several opportunities to view the defendant. The first was at the phone booth, where he first approached and conversed with her. The second was as she was walking on the street and he was following her; she looked at him face to face as he was 'across the street' from her while she walked in the middle of the road. The third was when, according to her testimony, he punched her in the mouth before sexually assaulting her. The fourth was shortly after the attack, while she was in a car being driven by her girlfriend's husband, who had been passing by and picked her up and drove her to the police station. The fifth was some time after the assault, when, according to her testimony, she was riding on a bus and saw the defendant on the sidewalk; the victim was with her boyfriend, but told him not to accost the defendant, to 'just leave it alone.' The sixth was at the time of the defendant's arrest, when she saw the defendant on the corner of Stratford Avenue and East Main Street . . . .

"The victim positively identified the defendant in the courtroom as her assailant. Furthermore, in her written statement to the police on the day after the assault, she described the defendant as follows: 'He was P/R [Puerto Rican] male about 30 or 31 years old about 5 [feet] 7 [inches] tall [medium] build, he had brown eyes and brown hair. His hair was curly and short to his head. He was top heavy and had skinny legs. *He had a mustache that came below his top lip.* He had short stubby hands and his nails were all black like he was a mechanic, his finger nails were all covered with grease. He had a wedding band on his left hand that was diamond cut and it had three stars in it. *His front teeth were straight but he had like a fang in the middle of the front teeth.'* . . . Her testimony was consistent with this description. She described the defendant's tooth

as 'like a fang. It was like it came in the middle of his mouth, straight down in the middle of his two front teeth.' A photograph of the defendant, taken on March 8, 1991, is consistent with this description, particularly indicating a mustache that falls below the outer edges of the defendant's lips, and a distinctively pointed tooth in the center between his two top teeth. The victim identified this photograph as indicating what she meant by her description of the defendant's front tooth.

"On the other side of the ledger, the victim's credibility was not unassailable. She had been convicted of failure to appear in the first degree, larceny in the second degree, larceny in the first degree and larceny in an unspecified degree. Furthermore, before encountering the defendant, she had been drinking in a bar for approximately three and one-half hours, and had consumed five or more drinks consisting of 'forty-three liquor and milk.' Although she denied being drunk, she admitted that she was 'feeling good.'

"There were, moreover, some inconsistencies in her testimony. Although she testified that she had never seen the defendant before, she told the police in her statement that, when he had approached her at the phone booth he had told her his name, that he knew her father, and that he knew that her father had been shot, which was in fact true. Also, although she testified that the defendant had punched her in the mouth, causing 'bad' bleeding, the hospital report did not confirm that injury. Furthermore, although she testified that the defendant had penetrated her anally, and not vaginally, and had described the assault that way to both the police and the examining physician, the nurse's notes also indicated her having reported a vaginal penetration.

"Ultimately, the trial court, having heard all of the evidence, believed the victim's identification of the

defendant. In finding that the state had proven 'beyond a reasonable doubt . . . that the defendant was responsible for the attack,' the court stated: 'Her description was a very accurate and detailed one. There was plenty of opportunity, both outside the restaurant, at the phone booth and subsequently, for her to have seen this individual. The court heard her testimony, watched her as she identified the defendant very, very quickly and very adamantly as the person that was responsible.' " (Emphasis in original.) *State* v. *Morales,* supra, 232 Conn. 731–34 (*Borden, J.,* concurring).

It is "the absolute right and responsibility of the [trier of fact] to weigh conflicting evidence and to determine the credibility of the witnesses." *State* v. *Reddick,* 33 Conn. App. 311, 333, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994). In examining the strengths and weaknesses of the state's and the defendant's cases, "[w]e afford great deference to findings of fact consistent with guilt unless they are improbable and unconvincing." *State* v. *Wolff,* 29 Conn. App. 524, 529, 616 A.2d 1143 (1992). In our review of the facts of this case in light of those principles, we find that the trial court properly could have concluded that the defendant suffered little prejudice as a result of the unavailability of the victim's jacket.

In weighing the four factors of the *Asherman* test, we conclude that the trial court properly "balance[d] the totality of the circumstances surrounding the missing evidence"; *State* v. *Morales,* supra, 232 Conn. 727; in denying the defendant's motion to dismiss and, therefore, that the defendant's right to due process of law under article first, § 8, of the Connecticut constitution was not violated.

The judgment is affirmed.

In this opinion the other judges concurred.