******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MICHAEL FOX
## (AC 41009)

Lavine, Keller and Bishop, Js.

*Syllabus*

Convicted of the crimes of home invasion, conspiracy to commit home invasion, assault in the first degree, and conspiracy to commit assault in the first degree in connection with the assault of the victims, H and E, the defendant appealed to this court. The defendant, along with two others, allegedly broke into H's apartment and assaulted H and E. A police officer, A, testified that he took certain photographs of the scene, including photographs of certain doors of the premises, but while some of the photographs resulted in discernable images, others did not. On appeal, the defendant claimed, inter alia, violations of the federal and state constitutions. *Held*:

1. The trial court violated the defendant's right against double jeopardy by sentencing him on two counts of conspiracy pursuant to a single agreement with multiple criminal objectives, as the defendant's conviction of both conspiracy charges stemmed from a single unlawful agreement to enter the premises and harm E; accordingly, the proper remedy was to remand the case with direction to vacate the defendant's conviction of conspiracy to commit assault in the first degree, and resentencing was not necessary, where, as here, vacatur of the defendant's conviction and sentence for conspiracy to commit assault in the first degree would not alter his total effective sentence.

2. The defendant could not prevail on his claim that the state violated his right to due process under the Connecticut constitution as a result of the destruction or loss of photographs depicting the crime scene, which was based on his claim that the police failed to preserve potentially exculpatory evidence in the form of photographs of the doors of H's apartment, the defendant having failed to meet the balancing test set forth in *State* v. *Asherman* (193 Conn. 695), which was applicable to his due process claim: the defendant could not establish the materiality of the indiscernible photographs from the apartment, as the weight of the evidence established that the defendant unlawfully entered or remained in H's apartment, forced entry was not a necessary element of the home invasion charge, although it could be probative of unlawful entry, and there was not a reasonable probability that, had the photographs been discernable, the result of the proceeding would have been different; moreover, the likelihood of mistaken interpretation of the missing evidence by the witnesses or jury was low given the ample testimony regarding the photographs, nothing in the record indicated that the state's failure to preserve useful photographic evidence of the condition of the doors was the result of any bad faith or improper motive on the part of the state or law enforcement, and the defendant failed to show that he was prejudiced as a result of the unavailable evidence, as the court found that the defendant received all evidence available to the state, including any indiscernible photographs, and the state had a strong case with regard to the home invasion charge.

3. The trial court did not err when it denied the defendant's request for an adverse inference jury instruction related to the failure of the police to produce discernable photographs of the apartment doors; no factual basis existed for the specific charge requested by the defendant, as the record was devoid of any evidence that the police investigation was incomplete or that, in their investigation, the police had acted negligently or in bad faith, and even if the trial court should have delivered the requested instruction, in light of the evidence as a whole, its failure to do so was harmless because the defendant failed to show that it was more probable than not that the failure to give the requested instruction affected the result of the trial.

Argued May 16—officially released August 27, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of home invasion, conspiracy to commit home invasion, assault in the first degree, and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of Ansonia-Milford, geographical area number twenty-two, and tried to the jury before *Markle, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed in part*; *judgment directed.*

*Megan L. Wade*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, was *Kevin D. Lawlor*, deputy chief state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Michael Fox, appeals from the judgment of conviction, rendered after a jury trial, of home invasion in violation of General Statutes § 53a-100aa (a) (1), conspiracy to commit home invasion in violation of General Statutes §§ 53a-48 and 53a-100aa (a) (1), assault in the first degree in violation of General Statutes § 53a-59 (a) (4), and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (4). On appeal, the defendant claims that (1) the trial court violated the double jeopardy clause of the United States constitution by sentencing the defendant on two counts of conspiracy on the basis of a single agreement with multiple criminal objectives, (2) the state violated the defendant's right to due process under the Connecticut constitution as a result of the destruction or loss of photographs depicting the crime scene, and (3) the trial court erred in denying the defendant's request for an adverse inference jury instruction. We agree with the defendant's first claim only and, accordingly, affirm in part and reverse in part the judgment of the trial court.

The jury reasonably could have found the following facts. Nicole Hart resided in Milford in an in-law apartment (apartment) connected to a main residence. The apartment consists of a bedroom, bathroom, kitchen, and living room. An interior door separates the apartment from the main residence. At the time of the incident in question, Nicole Hart's grandmother, Dorothy Hart, owned the dwelling and lived in the main residence, along with Nicole Hart's cousin, Thomas Hart, and Nicole Hart's father. Nicole Hart's cousin, Christopher Hart, also lived in the main residence at the time of the incident. Nicole Hart and Joe Fox, the defendant's brother, were involved romantically, intermittently from 2007 through October, 2014, and they share a child together. Joe Fox lived with Nicole Hart in the apartment for several weeks, from late September through mid-October, 2014, until the two ended their relationship in the second week of October, 2014.

On October 26, 2014, Thomas Hart texted Joe Fox, alerting him that Nicole Hart's new boyfriend, Anthony Esposito, was at the apartment. Later in the day, Thomas Hart drove to a park near the dwelling where he met Joe Fox, who was driving a vehicle with two passengers: the defendant and Zachary Labbe. Joe Fox then followed Thomas Hart to the dwelling where Thomas Hart, Joe Fox, the defendant, and Labbe exited their vehicles. At approximately 11:30 p.m., the four men entered the main residence through the front door on the left-hand side of the dwelling and proceeded into the apartment. The defendant, Joe Fox, and Labbe then entered Nicole Hart's bedroom where she was in bed asleep with Esposito. Joe Fox dragged Nicole Hart, by her neck, from the bedroom into the adjoining

kitchen where he directed expletives at her and strangled her, causing her to lose control of her bladder. From the kitchen, Nicole Hart could hear crashing noises coming from the bedroom where the defendant, Labbe, and Esposito were located. Joe Fox returned to the bedroom where he, the defendant, and Labbe punched and kicked Esposito. Nicole Hart went to the main residence to call 911 from the residence's landline telephone. Meanwhile, Joe Fox, the defendant, Thomas Hart, and Labbe exited the apartment and left in the same cars in which they had arrived.

Police arrived at the residence at approximately 11:45 p.m. where they found Esposito, who was bleeding and bruised about his head and face. Police also observed blood on the floor of the entry way of Nicole's bedroom as well as on the mattress in Nicole's bedroom. An ambulance took Esposito to the hospital where he was treated for orbital wall fractures of both eyes, a nasal bone fracture, a closed head injury, and lacerations to the inside of his mouth.

Later that same night, police located the vehicle that Joe Fox had used to transport himself, the defendant, and Labbe to and from the dwelling. Law enforcement found Esposito's blood on the steering wheel, exterior driver's side door handle, and exterior driver's side door of the vehicle in question. Lieutenant Richard Anderson, of the Milford Police Department, obtained an arrest warrant for the defendant. The defendant was arrested on October 31, 2014, and subsequently charged with home invasion in violation of § 53a-100aa (a) (1), conspiracy to commit home invasion in violation of §§ 53a-48 and 53a-100aa (a) (1), assault in the first degree as to Esposito in violation of § 53a-59 (a) (4), and conspiracy to commit assault in the first degree as to Esposito in violation of §§ 53a-48 and 53a-59 (a) (4).

Following a jury trial, the defendant was found guilty of home invasion, conspiracy to commit home invasion, assault in the first degree, and conspiracy to commit assault in the first degree. The defendant received a total effective sentence of ten years of incarceration.[1] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court violated the double jeopardy clause of the United States constitution by sentencing him on two counts of conspiracy pursuant to a single agreement with multiple criminal objectives. Specifically, he argues that the court committed plain error when it rendered judgment and sentenced him on the charges of conspiracy to commit home invasion and conspiracy to commit assault in the first degree because both of those counts stemmed from a single unlawful agreement to enter the apartment and harm Esposito. In its reply brief, the state agrees with the

defendant that there was only one conspiracy and therefore the defendant's conviction of two counts of conspiracy constitutes a violation of the defendant's right against double jeopardy. We, too, agree that a double jeopardy violation exists and that the appropriate remedy is to reverse the judgment of conspiracy to commit assault in the first degree and remand the case to the trial court with direction to vacate the defendant's conviction of conspiracy to commit assault in the first degree.

The defendant concedes, and the state agrees, that his double jeopardy claim was not preserved at trial and thus seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 120 A.3d 1188 (2015).[2] The first *Golding* prong is met because the record is adequate for review. There is a clear record of the allegations underlying the defendant's convictions, as well as a clear record of the offenses of which he was convicted. "A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . ." (Internal quotation marks omitted.) *State* v. *Urbanowski*, 163 Conn. App. 377, 386–87, 136 A.3d 236 (2016), aff'd, 327 Conn. 169 (2017). Additionally, "claims of double jeopardy involving multiple punishments in the same trial present a question of law to which we afford plenary review." *State* v. *Kurzatkowski*, 119 Conn. App. 556, 568, 988 A.2d 393, cert. denied, 296 Conn. 902, 991 A.2d 1104 (2010); see also *State* v. *Burnell*, 290 Conn. 634, 642, 966 A.2d 168 (2009); *State* v. *Culver*, 97 Conn. App. 332, 336, 904 A.2d 283, cert. denied, 280 Conn. 935, 909 A.2d 961 (2006).

Further, the second *Golding* prong is met because a claim of a double jeopardy violation is of constitutional magnitude. The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall "be subject for the same [offense] to be twice put in jeopardy of life or limb . . . ." U.S. Const., amend. V.

The third *Golding* prong is also met because in the present case, the trial court convicted and sentenced the defendant on separate charges of conspiracy to commit home invasion in violation of §§ 53a-48 and 53a-100aa (a) (1), and conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (4) that were based on a single conspiratorial agreement. "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than

one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute . . . ." (Citations omitted; internal quotation marks omitted.) *Braverman* v. *United States*, 317 U.S. 49, 53–54, 63 S. Ct. 99, 87 L. Ed. 23 (1942). "[U]nder Connecticut law; see, e.g., *State* v. *Ortiz*, 252 Conn. 533, 559, 747 A.2d 487 (2000); it is a double jeopardy violation to impose cumulative punishments for conspiracy offenses if they arise from a single agreement with multiple criminal objectives." *State* v. *Wright*, 320 Conn. 781, 829, 135 A.3d 1 (2016). Here, both conspiracy convictions arose from the single agreement reached by the defendant, Joe Fox, Labbe, and Hart to enter the apartment and inflict serious injury to Esposito. Therefore, the charges in question arise out of the same act or transaction.

The fourth *Golding* prong is met because the state has failed to demonstrate that the alleged constitutional violation was harmless beyond a reasonable doubt. To the contrary, the state has conceded that the two conspiracy convictions violate the double jeopardy clause of the fifth amendment. Although the sentence imposed for conspiracy to commit assault in the first degree did not lengthen the total effective sentence imposed in this case; see footnote 1 of this opinion; other adverse consequences may result from the sentence. The Supreme Court has concluded that a cumulative conviction has "potential adverse collateral consequences"[3] that can independently qualify as a punishment. (Internal quotation marks omitted.) *Rutledge* v. *United States*, 517 U.S. 292, 302, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996).

When a defendant's double jeopardy rights have been violated because the court has imposed multiple sentences for conspiracy offenses that arose out of the same agreement, the proper remedy is for this court to reverse the judgment of conviction for the lesser offense of conspiracy, remand the case to the trial court with direction to vacate the conviction for the lesser offense of conspiracy, and to resentence the defendant accordingly. See *State* v. *Wright*, supra, 320 Conn. 829 (holding vacatur of lesser conspiracy offense, rather than merger, was proper remedy in case involving multiple punishments for cumulative conspiracy convictions arising from single agreement);[4] *State* v. *Steele*, 176 Conn. App. 1, 38, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017) (holding vacatur of lesser conspiracy offense, rather than merger, was proper remedy in case involving multiple punishments for cumulative conspiracy convictions arising from single agreement).

At oral argument, both parties agreed that it is not necessary to resentence the defendant because the requested remedy will not alter the defendant's total sentence. We agree that, while the trial court retains

the authority to restructure the defendant's sentence if that court determines that doing so is necessary to retain its original sentencing intent, it is unnecessary for this court to remand the case to the trial court for resentencing because vacatur of the defendant's conviction and sentence for conspiracy to commit assault in the first degree will not alter his total effective sentence. See footnote 1 of this opinion; see also *State* v. *Johnson*, 316 Conn. 34, 42–43, 111 A.3d 447 (2015); *State* v. *Steele*, supra, 176 Conn. App. 38–39.

II

The defendant next claims that the state violated his right to due process under the Connecticut constitution as a result of the "destruction or loss" of photographs depicting the crime scene. Despite the fact that the defendant refers to the photographs as destroyed or lost, the state counters, and we agree, that the photographs exist, but are merely indiscernible. The state contends that the record is inadequate to review this claim because the trial court did not make any factual findings concerning the indiscernible photographs. In the alternative, the state argues that, even if the record is adequate for review, the defendant's claim fails because the defendant cannot show that a constitutional violation exists and deprived him of a fair trial. We disagree with the state that the record is inadequate to review the claim, but agree with the state that, although the record is adequate for review and the defendant raises a constitutional claim, his claim ultimately fails because the alleged constitutional violation does not exist and did not deprive the defendant of a fair trial.

The following facts are relevant to our conclusion. At trial, Nicole Hart testified to the following facts: Joe Fox lived in the apartment with her for several weeks around October, 2014. Nicole Hart and Joe Fox ended their relationship around the second week of October, 2014, at which time Nicole Hart asked Joe Fox to leave the apartment and he moved out. Joe Fox took his belongings from the apartment and he did not have keys to the apartment or the main residence. Nicole Hart routinely locked the doors to her apartment and to her bedroom, "for sleeping purposes," and the doors were locked on the night of October 26, 2014, when she and Esposito went to sleep in her bedroom.

On the night of October 26, 2014, Nicole Hart awoke to the sound of two loud bangs, followed by the defendant, Joe Fox, and Labbe entering her bedroom. While the defendant, Joe Fox, and Labbe were punching and kicking Esposito, Nicole Hart asked them what they were doing in her house and to leave. Following the incident at the apartment, Nicole Hart observed damage to the apartment's entrance door and her bedroom door. Specifically, she observed that the apartment entrance door was "kicked in" and a screw was missing from the locking mechanism. She also observed that the

right-hand frame of her bedroom door had broken during the incident and the bedroom door did not lock as of the time of trial.

Other witnesses testified as to the condition of the apartment entrance door and bedroom door following the incident on October 26, 2014. Erika Berrios, then girlfriend of Nicole Hart's cousin, Christopher Hart, testified that Nicole Hart routinely locked and closed the apartment entrance door when she had visitors. Berrios further testified that the day following the incident, she observed damage to the apartment entrance door and noted that the lock was out of place. She also testified that Nicole Hart's bedroom door was "completely . . . damaged" and not "even worth fixing."

Thomas Hart testified that on the night of October 26, 2014, he observed Joe Fox trying to enter the apartment, but not being able to open the locked door. He further testified that he then left Joe Fox, entered the main residence, and subsequently heard a loud bang.

Anderson testified that he responded to the residence on October 26, 2014, following the incident, and observed damage to the apartment's entrance door and Nicole Hart's bedroom door. Specifically, he observed a broken door jamb and "some locking mechanism on the floor" with regard to the apartment's entrance door. With regard to Nicole Hart's bedroom door, he testified that it "looked like it was forced open," the door jamb was broken, and a locking mechanism was on the floor.

Susan Delgado, a Hart family friend and the sole defense witness, testified that the apartment entrance door was "never locked." She further testified that she spoke with Anderson by phone and went to the apartment the day following the incident and she did not observe damage to any of the doors in the apartment. On cross-examination, however, Delgado provided conflicting testimony regarding how many days following the incident she spoke with Anderson and visited the apartment.

Anderson testified to the following facts: As part of his investigation of the scene, he photographed relevant areas of the main residence and the apartment including the outside of the main residence, the entrance door to the apartment, the apartment bedroom door, the apartment bedroom, kitchen areas, and blood on the floor of the entryway to the apartment bedroom. For unknown reasons, some of the photographs Anderson took resulted in discernable images while others did not. Anderson noted, "[i]t's electronic equipment, sometimes it works, most of the time it works, but this time all the pictures did [not] come out." It was not until a later date that Anderson realized that some of the photographs taken on October 26, 2014, did not "come out." Three of the seven photographs taken by Anderson on October 26, 2014, were discernable and were

entered into evidence as State's Exhibits 6A, 6B, and 6C (photographs of blood on the floor of the entryway to the bedroom, blood on Nicole Hart's mattress, and exterior of the main residence, respectively).[5] Anderson took the photographs of the main residence and the apartment using a police issued Nikon digital camera. He did not know how old the camera was and he did not know whether the camera had a memory chip. Anderson testified that he took the photographs according to procedure and he thought he performed diligently. Anderson also testified on cross-examination that he only takes the photographs at the scene, while an evidence technician at the ID bureau extracts the photographs from the camera and prints the photographs. On cross-examination, when asked whether someone could have deleted photographs of the doors in question, Anderson responded, "[t]hey could have, yes." On redirect examination, Anderson reiterated that some of the photographs from October 24, 2016, did not come out and that he personally observed damage to both the apartment entry door and Nicole Hart's bedroom door.

On the last day of the state's case-in-chief, the defendant argued to the court that the state had failed to turn over all potentially exculpatory material in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the defendant argued that the state, or other governmental agencies, failed to turn over a video recording of inventory of a vehicle seized in connection with the case. The defendant also argued that he was not aware that photographs taken at the scene were missing and that he should have been provided with the opportunity to review the memory card from the police department's digital camera, if one so existed. In response, the state argued that, during discovery, it had provided the defendant with the video recording of the vehicle, as well as the seven photographs taken at the scene on October 24, 2016.[6] The state noted that three of the seven photographs, which presumably would have included images of the apartment doors, were "barely legible," did not "come out," and were "overexposed." At a later point in trial, the state described one of the photographs as "completely white," one as "completely dark," several as "grainy," and noted "that you can't see what they are." The state further noted that the photographs of the doors were not lost, rather, Anderson did not notice "until a later date that they did not come out." The state noted that it had provided all seven photographs to the defendant and that he had access to the ones that did not "come out."

The court noted that it was satisfied that the state had turned over all available evidence to the defendant, and that before the trial, the defendant was aware of the issue with the indiscernible photographs. Later in the trial, the court independently raised the defendant's

claim of a *Brady* violation and again concluded that the defendant had received all evidence available to the state, that the defendant had the ability to cross-examine Anderson as to the indiscernible photographs, and that no *Brady* violation existed.

On appeal, the defendant claims that his conviction of home invasion and conspiracy to commit home invasion violates his right to due process because the police failed to preserve potentially exculpatory evidence in the form of photographs of the doors of the apartment.[7] It is not disputed that the defendant did not raise a due process violation at trial, and therefore the defendant seeks review of the unpreserved claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 2 of this opinion.

Under the first *Golding* prong, we conclude that we have a sufficient record on appeal to consider the claim. Anderson testified at length about the photographs he took at the scene on October 26, 2014, and the fact that some of the photographs were indiscernible. He noted that he took photographs of the apartment's entryway door and Nicole Hart's bedroom door, but that neither of these photographs produced clear images. The defendant had ample opportunity to cross-examine Anderson as to the indiscernible photographs and did in fact question him at length about the camera used, the witness's camera training, the procedure for extracting photographs from the camera, and the reason the photographs did not come out. In addition to both parties questioning Anderson, the court ruled on the defendant's oral motion in which he claimed that he was not aware that some of the photographs taken at the scene were indiscernible and that he should have been given an opportunity to review the camera's memory card. The court concluded that the defendant had access to all evidence in the possession of the state, and that the state had no further obligation to provide the defendant with information to which it did not itself have access. The state claims that the record is inadequate for review because the trial court did not weigh "the reasons for the unavailability of the evidence against the degree of prejudice to the accused." (Internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 301, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). We conclude, on the basis of the testimony adduced at trial and the trial court's ruling with regard to the indiscernible photographs, that the record is adequate to review the claim and, therefore, the first *Golding* prong is met.[8]

The second *Golding* prong is also met because the defendant's claim is of constitutional magnitude alleging the violation of a fundamental right. Specifically, the defendant claims a due process violation in derogation of his rights under article first, § 8, of the constitution of Connecticut.[9]

The defendant's claim fails, however, on the third *Golding* prong because the defendant's alleged due process violation does not exist and the defendant was not deprived of a fair trial. "With respect to a due process violation for failure to preserve under the federal constitution, the United States Supreme Court has held that the due process clause of the fourteenth amendment requires that a criminal defendant . . . show bad faith on the part of the police [for] failure to preserve potentially useful evidence [to] constitute a denial of due process of law." (Internal quotation marks omitted.) *State* v. *Smith*, 174 Conn. App. 172, 182, 166 A.3d 691, cert. denied, 327 Conn. 910, 170 A.3d 680 (2017); see also *Arizona* v. *Youngblood* 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

In *State* v. *Morales*, 232 Conn. 707, 720–21, 657 A.2d 585 (1995), our Supreme Court rejected the federal bad faith requirement and instead held that, when a due process claim is advanced under the Connecticut constitution, our courts should employ the balancing test set forth in *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). In determining whether the reasons for the unavailability of the evidence outweigh the degree of prejudice to the accused, the *Asherman* test reviews the totality of the circumstances surrounding the missing evidence. *State* v. *Morales*, supra, 720–21. Specifically, the *Asherman* test considers "the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its unavailability to the defense and the prejudice to the defendant caused by its unavailability . . . ." Id., 722–23. The reason for the missing evidence's nonavailability factor concerns the state's involvement and the remaining three factors scrutinize the impact of the missing evidence on the trial. Applying this test, we conclude that the defendant's right to due process under the state constitution was not violated.

The first *Asherman* factor is the materiality of the missing evidence. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Estrella*, 277 Conn. 458, 485, 893 A.2d 348 (2006). On the other hand, "[t]he defendant's mere speculation that the [lost evidence] could have been beneficial *or not* does not meet the standard necessary to prove materiality." (Emphasis in original.) *State* v. *Barnes*, 127 Conn. App. 24, 33, 15 A.3d 170 (2011), aff'd, 308 Conn. 38, 60 A.3d 256 (2013).

Under this standard, the defendant cannot establish the materiality of the indiscernible photographs from the apartment. As a preliminary matter, the photographs in question were not lost or missing, but rather, the photographs of the apartment doors were indiscernible.

The trial court ruled that the state turned over all evidence in its possession to the defendant, including the photographs that did not produce clear images. Nevertheless, the defendant contends that his conviction of home invasion and conspiracy to commit home invasion should be reversed and remanded as a result of the alleged due process violation.

In light of the language of the home invasion statute under which the defendant was convicted, there is not a reasonable probability that the result of the proceeding would have been different, even if the photographs were discernable. Section 53a-100aa (a) provides in relevant part: "A person is guilty of home invasion when such person enters or remains unlawfully in a dwelling . . . ." The express language of the statue does not require that the defendant enter the dwelling using force, or that he cause any damage upon entering. Nicole Hart's testimony established that the defendant did not have permission to enter the apartment, and also that he remained unlawfully in the apartment on October 26, 2014, after she told him and the other perpetrators to leave. Although forced entry is not a necessary element to prove home invasion, evidence of forced entry may be probative of unlawful entry and, thus, three witnesses testified as to the damaged doors of the apartment. Even though the defendant's witness, Susan Delgado, testified that the doors were not damaged, the defendant is incorrect in his assertion that had the photographs been discernable, the result of the proceeding would have been different. The weight of the evidence presented at trial established that the defendant unlawfully entered or unlawfully remained in the apartment. We are not persuaded, in light of the evidence in its entirety and the essential elements of the offense, that there is a reasonable probability that had the photographs of the doors been discernible, the result of the proceeding would have been different.

"In further examining the materiality of potentially exculpatory evidence under the *Asherman* test, a critical factor that our courts have considered is the defendant's lack of interest in the evidence." *State* v. *Morales*, 39 Conn. App. 617, 625, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). "The fact that a defendant failed to request the evidence goes to the issue of materiality and whether the defendant deemed it significant." *State* v. *Morales*, supra, 232 Conn. 712 n.7. Here, the defendant failed to raise the issue of the indiscernible photographs, or his ability to review the camera from which they were taken, until the last day of the state's case-in-chief. Outside the presence of the jury, the defendant maintained that he did not learn of the missing photographs until Anderson's testimony. The state, however, claimed that, during discovery, it had turned over all photographs to the defendant, including the three that were indiscernible. The prosecutor also claimed that he and the defendant had dis-

cussed the issue of the photographs "numerous times" prior to trial. The court ruled that it was satisfied that the state had turned over the evidence in its possession and that the defendant should have raised the issue during discovery, rather than on the last day of the state's case-in-chief. Therefore, because there is not a reasonable probability that the evidence would have changed the outcome of the trial, and because the defendant showed a lack of interest in the evidence prior to trial, the defendant is unable to establish the materiality of the indiscernible photographs.

The second *Asherman* factor considers the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury. Mistaken interpretation can be "minimized at the trial by permitting testimony on the issue . . . ." *State* v. *Leroux*, 18 Conn. App. 223, 233, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989). In this case, the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury is low. Anderson testified, on both direct and cross-examination, that he took photographs on the scene and that some of the photographs did not come out. Given the ample testimony regarding the missing photographs, the likelihood of mistaken interpretation by the witnesses or jury is low.

The third *Asherman* factor concerns the reasons for the nonavailability of the evidence, namely, the motives underlying the loss of the evidence. In analyzing this factor, courts examine "whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Weaver*, 85 Conn. App. 329, 353, 857 A.2d 376, cert. denied, 271 Conn. 942, 861 A.2d 517 (2004). Here, nothing in the record indicates that the state's failure to preserve useful photographic evidence of the condition of the doors was the result of any bad faith or improper motive on the part of the state or law enforcement. Anderson testified that, as part of routine procedure, he took photographs of the main residence and the apartment, including the apartment entry and bedroom doors. He further testified that, for an unknown reason, some of the photographs did not come out, but that he had followed procedure and performed his duties diligently. In ruling on the defendant's oral motion regarding the photographs, the court observed that the defendant had received all evidence available to the state, including any indiscernible photographs. Therefore, the defendant is unable to establish that the indiscernible photographs are the result of improper motive or animus on the part of the state.

The final *Asherman* factor concerns the prejudice caused to the defendant as a result of the unavailability

of evidence. "In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." (Internal quotation marks omitted.) *State* v. *Joyce*, supra, 243 Conn. 303. Under this analysis, the state had a strong case with regard to the home invasion claim. Nicole Hart testified that the defendant did not have permission to be in the apartment, that the doors were locked when she and Esposito went to sleep on October 26, 2014, and that she awoke to the sound of her doors being forcefully opened. Nicole Hart also testified that she told the defendant, Joe Fox, and Labbe to leave the apartment as they were punching and kicking Esposito. Further, she testified that her doors sustained physical damage on the night in question. In addition to Nicole Hart's testimony, Anderson, Thomas Hart, and Erika Berrios all testified that they observed physical damage to the doors of the apartment. Given the testimony of the state's witnesses, the state's case was strong with regard to whether the defendant unlawfully entered or unlawfully remained in the apartment. In contrast, the defendant presented one witness, Susan Delgado, who testified that she did not observe damage to the doors on the day following the incident. The defendant also extensively questioned Anderson on cross-examination as to the reason for the indiscernible photographs. As a result of the foregoing evidence, we cannot conclude that the defendant was prejudiced as a result of the unavailable evidence.

For the foregoing reasons, we conclude that the defendant has failed to demonstrate that his right to due process under the Connecticut constitution has been violated by the state's failure to produce discernible photographs of the doors at issue.

III

The defendant next claims that the trial court erred in denying his request for an adverse inference jury instruction related to the failure of the police to produce discernable photographs of the apartment doors. We disagree.

The following additional facts are relevant to our analysis. At trial, the defendant filed a request to charge, including a proposed instruction as to the indiscernible photographs of the doorways and the investigation by the police as a whole. The proposed instruction read as follows: "Investigation which is thorough and conducted in good faith may be more credible while an investigation which is incomplete, negligent, or in bad faith may be found to have lesser value or no value at all. In deciding the credibility of the witnesses and the weight, if any, to give the prosecution evidence, consider whether the investigation was negligent and/or conducted in bad faith. If the police inadequately inves-

tigated one matter, you may infer that the prosecution also inadequately investigated other matters. Based on this inference alone you may disbelieve the prosecution witnesses and evidence. This may be sufficient by itself for you to have a reasonable doubt as to the defendant's guilt." The court heard from the parties before the defendant presented his witness, Susan Delgado, and noted that "I don't know if it was negligent or not that the picture didn't come out because there are no facts underlying it. . . . I can't find an evidentiary basis to say that it's negligent that something didn't come out."[10] After hearing from Delgado, the court revisited the defendant's adverse inference instruction request and noted that the defendant's requested instruction "would have to be based on some sort of evidence . . . that the police were negligent in some way. [Susan Delgado's] testimony does not in any way indicate anything about the police investigation really. . . . I'm going to decline giving that instruction. I just don't think there's any evidence there."

"[T]o prevail on appeal, [the defendant] must show both that the trial court abused its discretion in refusing to give the adverse inference instruction on the [missing evidence] and that it was more probable than not that the failure to give the requested instruction affected the result of the trial." (Internal quotation marks omitted.) *State* v. *Johnson*, 67 Conn. App. 299, 314, 786 A.2d 1269 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). "Although an adverse inference instruction may be appropriate under certain circumstances, a trial court is not required to give an adverse inference instruction in every case involving missing evidence." (Internal quotation marks omitted.) Id.

We agree with the court's determination that no factual basis existed for the specific charge requested by the defendant. The record is devoid of any evidence that the police investigation was incomplete or that, in their investigation, the police had acted negligently or in bad faith. Anderson testified that the police department taught him how to take photographs using the camera. He further testified that his responsibilities did not include transferring the digital images for printing. Anderson testified that he followed procedure, believed he was diligent, and that sometimes the photographs from investigations did not come out. He also testified that part of his due diligence as a police officer includes ensuring that photographs have been taken by reviewing them. In this case, Anderson reviewed the photographs at a later date, at which point he realized three were indiscernible. The reason for the indiscernibility of the photographs remains unknown, but none of the evidence adduced at trial attributes their condition to an incomplete, negligent, or bad faith police investigation.

Even if we were to conclude that the court should

have delivered the requested instruction, we are persuaded in light of the evidence as a whole that its failure to do so was harmless because the defendant has failed to show that it was more probable than not that the failure to give the requested instruction affected the result of the trial. The state's case included three eyewitnesses who testified that the apartment doors were damaged after the incident. Additionally, Nicole Hart and Esposito both positively identified the defendant as one of the intruders and perpetrators of the assault. In light of the ample evidence that the defendant entered and remained unlawfully in the apartment, had the court delivered the requested adverse inference instruction to the jury, we do not agree that it is more probable than not that the outcome of the trial would have been different. Accordingly, we conclude that the court did not err in denying the defendant's requested adverse inference jury instruction regarding the police investigation.

The judgment is reversed only as to the conviction of conspiracy to commit assault in the first degree and the case is remanded with direction to vacate the defendant's conviction of that offense. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Pursuant to statutory mandatory minimum sentence provisions, the trial court imposed a sentence of ten years of incarceration for the count of home invasion, ten years for the count of conspiracy to commit home invasion, and one year to serve for the counts of assault in the first degree and conspiracy to commit assault in the first degree. The court ordered each of the sentences to run concurrently to each other, for a total effective sentence of ten years of incarceration.

[2] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yaisel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding* by eliminating word "clearly" before words "exists" and "deprived").

[3] The United States Supreme Court recognized potential adverse collateral consequences stemming from cumulative convictions such as delaying a defendant's eligibility for parole, increasing a sentence under a recidivist statute for a future offense, impeaching a defendant's credibility, or stigmatizing the defendant. *Rutledge* v. *United States*, 517 U.S. 292, 302, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996)

[4] The court in *Wright* extended our Supreme Court's holding in *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), which established vacatur as the proper remedy for double jeopardy violations resulting from the imposition of multiple sentences related to greater and lesser included offenses. *State* v. *Wright*, supra, 320 Conn. 829.

[5] The state also entered into evidence twenty-two photographs of the crime scene, which were taken at a later date following the October 24, 2016 incident. Anderson did not take the twenty-two additional photographs of the crime scene. The clarity of these photographs, State's Exhibits 1A-1U and 3A, was not in dispute at trial.

[6] The state entered into evidence only three of the seven photographs taken at the scene on October 26, 2014 (State's Exhibits 6A, 6B, and 6C).

[7] At trial, the defendant claimed that, had the photographs been discernible, they could have been exculpatory because they may have shown lack

of forced entry into the apartment. The state noted that forced entry is not an element of a home invasion claim. The court noted that the defendant had not provided any evidence in support of the fact that the photographs would have been exculpatory.

[8] In response to the defendant's oral claim of a *Brady* violation, the court noted, "if they handed over the discovery and you fully reviewed the discovery, and you saw that there were not pictures, something that you felt was important, you didn't address it with the state's attorney?" The court further noted, "[y]ou have what they have. You have an explanation, you may not like what happened or you may feel that that's wrong, you know, that you cross-examined the police officer as to how did it happen, why did it happen. You had that ability. You asked the questions. And so, I'm not left with any evidence of any type of *Brady* violations at this point in time."

[9] The due process clause provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Conn. Const., art. I, § 8.

[10] During the court's colloquy with defense counsel, the court asked whether the police have a duty to take photographs of a crime scene or if they can use their discretion. The court appeared to draw a distinction between whether the issue with the photographs was the result of negligent conduct by the police or whether it was attributable to unknown technical reasons, or in the court's words, a "technical snag." Defense counsel did not appear to have a response as to whether a mere technical failure was the cause of the indiscernible photographs, but responded that it was his position that the police, through their training and experience, have a duty to take and review on-scene photographs.