******************************************

    The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

    All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

    The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* BENNIE GRAY, JR.
## (AC 43339)

Prescott, Moll and Cradle, Js.

*Syllabus*

Convicted, after a jury trial, of the crime of possession of narcotics with intent to sell, the defendant appealed to this court. After observing a suspected narcotics transaction between the defendant and D, police officers recovered crack cocaine on D and seized $1268 in cash from the defendant. Prior to trial, the defendant filed a motion for discovery requesting that the state produce the money seized during his arrest. The state responded that it could not produce the exact currency because the police department, in accordance with its policy, had deposited those funds immediately into a secure bank account. The defendant subsequently filed a motion to dismiss the charges against him or, in the alternative, to suppress any evidence relating to the currency, which the trial court denied. Also prior to trial, the state provided the defendant with a copy of a forensic lab report describing the narcotics as being contained within "knotted plastic," which contradicted certain other pretrial statements. The defendant argued that these discrepancies presented a chain of custody issue and requested that his standby counsel subpoena the lab for any photographs taken of the seized narcotics. At trial, a forensic lab employee produced two photographs of the narcotics as initially received by the lab, which were admitted into evidence as a defense exhibit, and testified that the narcotics appeared to be contained within a knotted plastic bag. The defendant presented testimony, during his case-in-chief, that the narcotics were "loose" when recovered by the police, and not placed into a plastic bag, then moved for a judgment of acquittal based on the chain of custody issue. After the state recalled certain witnesses on rebuttal, the trial court denied the defendant's motion for a judgment of acquittal. When the defendant asked to call additional lab employees as witnesses, the state presented additional testimony from forensic lab employees and introduced an enlarged copy of one of the forensic lab photographs already in evidence. The witnesses testified that what they originally believed to be knotted plastic looked to be a glare or reflection in the enlarged photograph. The trial court subsequently denied the defendant's postverdict motions for a new trial or, in the alternative, a mistrial, based on the state's late disclosure of the forensic lab photographs. *Held*:

1. The trial court did not violate the defendant's right to due process under article first, § 8, of the state constitution by denying his pretrial motion to dismiss the charges against him or, in the alternative, to suppress any evidence relating to the currency seized during his arrest: although this court determined that the police department's improper disposition of the currency violated the requirements of the applicable statute (§ 54-36a (b) (3) (B)) and demonstrated a reckless disregard of the defendant's right to a hearing on the currency's disposition, this court also concluded, applying the factors set forth in *State* v. *Asherman* (193 Conn. 695), that the seized currency was immaterial because it was speculative whether the defendant's examination or testing of the currency would have led to exculpatory evidence that affected the outcome of the proceeding, the currency's absence was unlikely to lead to misinterpretation of the evidence by the jury, and, considering the strength of the state's case, as well as the defendant's opportunity to engage in unfettered cross-examination and to raise doubt about the significance of the seized currency during closing argument, the defendant was not prejudiced by the currency's unavailability.

   (*One judge concurring separately*)

2. The defendant could not prevail on his claim that the trial court abused its discretion by denying his postverdict motions for a new trial or, in the alternative, a mistrial, as the defendant failed to demonstrate that the state's late disclosure of the forensic lab photographs violated his right to due process under *Brady* v. *Maryland* (373 U.S. 83): the defendant could not demonstrate that the forensic lab photographs were

favorable to his defense because, although there was confusion at trial regarding the presence of a knotted plastic bag with the narcotics, the enlarged photograph clearly demonstrated that the photographs at issue did not depict knotted plastic and, therefore, did not support his challenge to the chain of custody.

3. This court declined to review the defendant's claim that the trial court abused its discretion by permitting the state to present as evidence the enlarged lab photograph of the narcotics and related witness testimony on rebuttal, the defendant having invited any error that may have arisen from the trial court's decision to permit such evidence: although the defendant initially argued against the state's introduction of witness testimony on rebuttal, he repeatedly asked to call additional lab employees to testify as to the forensic lab photographs and documents related to the narcotics after the court denied his motion for a judgment of acquittal and, only thereafter, did the witnesses examine the enlarged photograph and testify that what originally appeared to be knotted plastic was actually glare or reflected light; moreover, the defendant was given a full and fair opportunity to cross-examine the witnesses regarding the condition in which the lab received the narcotics and to elicit testimony regarding any discrepancies.

Argued October 19, 2021—officially released May 3, 2022

*Procedural History*

Substitute two part information charging the defendant, in the first part, with one count each of the crimes of possession of narcotics with intent to sell and possession of narcotics, and, in the second part, with having previously been convicted of possession of narcotics with intent to sell, brought to the Superior Court in the judicial district of New London, geographical area number ten, where the first part of the information was tried to the jury before *Kwak, J.*; verdict of guilty of possession of narcotics with intent to sell; thereafter, the defendant pleaded guilty to the second part of the information; subsequently, the state entered a nolle prosequi as to the charge of possession of narcotics; thereafter, the court, *Kwak, J.*, rendered judgment of guilty in accordance with the verdict and the plea, from which the defendant appealed to this court. *Affirmed.*

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, with whom, on the brief, were *Paul J. Narducci*, state's attorney, and *Sarah Bowman*, assistant state's attorney, for the appellee (state).

*Opinion*

CRADLE, J. The defendant, Bennie Gray, Jr., appeals from the judgment of conviction, rendered after a jury trial, of possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a). On appeal, the defendant claims that the trial court (1) improperly denied his motion to dismiss the charges against him or, in the alternative, to suppress any evidence relating to currency seized during his arrest, thereby violating his right to due process under article first, § 8, of the Connecticut constitution, (2) abused its discretion by denying the defendant's postverdict motion for a new trial or, in the alternative, for a mistrial based on the state's late disclosure of forensic lab photographs, and (3) abused its discretion by permitting the state, on rebuttal, to present an enlarged copy of a lab photograph already in evidence and witness testimony on that photograph. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the late afternoon hours of May 9, 2018, four plainclothes officers from the vice and narcotics unit of the New London Police Department[1] (police department) were conducting surveillance near the intersection of Broad Street and Ledyard Street in New London. The officers were monitoring two convenience stores, the Gulf station located at 265 Broad Street and the 7-Eleven situated at the corner of Broad Street and Parker Street, which were locations known for narcotics trafficking. The officers were divided into teams of two, with investigators Todd Lynch and Jeremy Zelinski occupying one unmarked vehicle, and investigators Ryan Griffin and Joseph Pelchat occupying another.

At approximately 4:30 p.m., the officers noticed a man, later identified as Brian Drobnak, standing alongside a Volvo sedan parked on the right side of the Gulf station parking lot. The officers observed Drobnak pace back and forth alongside the vehicle and continuously check his cell phone. They did not see Drobnak purchase gasoline, enter the convenience store, or use the air pressure machine near where the Volvo was parked.

Shortly thereafter, a dark blue Toyota Camry, operated by a man later identified as the defendant, drove into the Gulf station and stopped alongside the Volvo. The officers observed Drobnak enter the front passenger seat of the Toyota, remain inside the vehicle for less than one minute, exit the vehicle, and subsequently enter the Volvo through the driver's side door. The officers could not see what transpired between Drobnak and the defendant inside of the Toyota, but the brief nature of the interaction led them to believe that they had just witnessed a narcotics transaction. Accordingly, the officers decided that Lynch and Zelinski would investigate Drobnak, while Griffin and Pelchat would

follow the Toyota. Lynch and Zelinski then drove into the Gulf station parking lot at the same moment that the Toyota was exiting the lot, parked their unmarked vehicle behind the Volvo, and exited the vehicle.[2] Lynch walked toward the driver's side door of the Volvo while Zelinski approached the passenger's side.

Through the driver's side window, Lynch observed Drobnak sitting in the driver's seat with a white, rock like substance in his lap. Lynch later testified that Drobnak appeared to be manipulating the rock like substance with the ink cartridge of a ballpoint pen. Lynch identified himself as law enforcement, at which point Drobnak attempted to conceal the ink cartridge and rock like substance in the empty space between the driver's seat and the passenger's seat. Zelinski then opened the passenger side door, placed Drobnak in custody, and took possession of the rock like substance, which had fallen to the floor of the vehicle. Lynch performed a field test on the rock like substance, which returned positive for crack cocaine. Drobnak was arrested and given *Miranda*[3] warnings. At the scene, Drobnak voluntarily agreed to speak with Lynch and Zelinski. He informed the officers that he had purchased $50 worth of crack cocaine from the man in the Toyota and showed them the phone number he had contacted to arrange the transaction.

Meanwhile, Griffin and Pelchat continuously had been monitoring the Toyota operated by the defendant since it had exited the Gulf station. After leaving the parking lot, the defendant traveled down Broad Street and turned into a Sunoco station, where he remained for a few minutes. Griffin and Pelchat observed a woman, later identified as Amanda Barton, emerge from a restaurant next to the Sunoco station and walk toward the Toyota carrying two plastic bags. Once Barton entered the Toyota, the defendant exited the Sunoco parking lot and turned onto Connecticut Avenue.

As Griffin and Pelchat continued to follow the Toyota, they were informed by the other officers that Drobnak was found in possession of narcotics, was placed under arrest, and had told the officers that he had purchased the narcotics from the operator of the Toyota. Believing this information provided probable cause to conduct a motor vehicle stop, Griffin and Pelchat requested that the police department send a marked police cruiser to assist them in apprehending the Toyota.[4] Sergeant Gregory Moreau, the street sergeant assigned to the patrol shift, responded to the officers' request.

Shortly thereafter, Moreau pulled behind Griffin and Pelchat, who were still following the defendant down Briggs Street. Moreau then maneuvered his police cruiser between the Toyota and the officers' unmarked vehicle, activated his siren and overhead lights, and attempted to initiate a motor vehicle stop. Despite the siren and headlights, the defendant continued to drive forward

at a slow speed. Moreau then used his vehicle's public address system to order the defendant to pull the Toyota over to the side of the road. After proceeding an additional two to four hundred feet, the defendant came to a stop. Moreau exited the police cruiser and walked toward the driver's side window of the Toyota, while Griffin, who had exited the unmarked vehicle, began to approach the Toyota on foot.

As Griffin drew closer to the Toyota, he observed Barton and the defendant appear to manipulate their hands near their waists. Concerned that Barton and the defendant could be concealing "weapons" or "narcotics" on their persons, Griffin and Moreau ordered the passengers to raise their hands to where the officers could see them. Barton complied immediately, but the defendant raised his hands only after Griffin issued a second verbal command. The officers removed Barton and the defendant from the Toyota and placed them in investigative detention. Griffin conducted a pat-down search of the defendant for weapons and, after feeling "a bulge in [the defendant's] pocket," uncovered $1268 in cash. Believing the cash to be the proceeds of narcotics transactions, the officers seized the currency. The officers also noticed three cell phones, including an LG cell phone, in the Toyota's center console. Although Barton and the defendant each claimed ownership of one of the phones, neither claimed to own the LG phone.[5]

Around that time, Pelchat, who had parked the unmarked vehicle a short distance away,[6] approached the defendant's Toyota. Pelchat had been in contact with Lynch, who communicated that Drobnak had provided the officers with the phone number he had used to arrange the narcotics transaction. The officers agreed that Lynch would use his city-issued cell phone to call the number once Pelchat arrived at the motor vehicle stop. When Lynch placed the call, Pelchat observed the unclaimed phone ring in the Toyota's center console and display Lynch's phone number as the incoming caller. The officers seized the phone. The defendant was then placed under arrest and transported to the police department. No narcotics, residue, or paraphernalia were recovered from the scene.

At the station, Lynch asked the defendant why he was involved in selling narcotics, to which the defendant responded, "that's all I know." The defendant was subsequently charged, by way of a substitute information dated March 25, 2019, with one count of possession of narcotics with intent to sell in violation of § 21a-277 (a), and one count of possession of narcotics in violation of General Statutes § 21a-279 (a).[7]

Drobnak was transported to the New London police station, where he provided a written statement indicating that he had purchased $50 worth of "loose crack cocaine" from "G," and had done so on "at least three different occasions." Drobnak was also shown a photographic

lineup consisting of eight photographs and was asked to determine whether one of those photographs displayed the individual from whom he had purchased narcotics. He identified an individual other than the defendant. Later, at trial, Drobnak identified the defendant as the individual from whom he had purchased narcotics and testified that he had purchased the narcotics using two $20 bills and one $10 bill. Drobnak explained that he initially misidentified the defendant because his "anxiety was off the wall," he was going through withdrawal, and he "just wanted [the police interview] to be over and to be done with." He then testified that "[t]here is no doubt in my mind that [the defendant] is the man who sold me crack cocaine." Drobnak also testified that he was previously familiar with the defendant and had purchased narcotics from the defendant at least twice before. During cross-examination, Drobnak admitted that "G" was actually the nickname of Greg Williams, a mutual acquaintance of Drobnak and the defendant. Although Drobnak identified "G" in his written statement, he testified that he had intended to refer to the defendant.

A jury trial commenced on April 2, 2019. At trial, the defendant, appearing as a self-represented party, testified in his defense that he had previously met Drobnak a few days prior to May 9, 2018, when Drobnak had given the defendant and Williams a ride to Groton. The defendant stated that he had left his son's cell phone—the same unclaimed LG phone recovered from the defendant's center console—in Drobnak's car. He further testified that he had met with Williams on the morning of May 9, 2018, and that Williams had returned the phone to him. The defendant asserted that Drobnak contacted him later that day in order to speak with him about the missing phone. The defendant agreed, and the two arranged to meet at the Gulf station.

The defendant testified that Drobnak briefly entered the defendant's car in the Gulf station parking lot and requested a financial reward for finding the missing cell phone. The defendant told Drobnak that the phone already had been returned to him and asked Drobnak to exit his car. The defendant denied selling narcotics and testified that the seized currency was income he had earned working as a groundskeeper at Lake of Isles golf course in North Stonington. He asserted that he planned to use the money to pay for rent.

The jury found the defendant guilty of possession of narcotics with intent to sell.[8] On July 8, 2019, the court, *Kwak, J.*, sentenced the defendant to twenty years of incarceration, execution suspended after twelve years, followed by five years of probation. The Sentence Review Division of the Superior Court subsequently reduced the sentence to twelve years of incarceration, execution suspended after seven years, followed by five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the trial court improperly denied his pretrial motion to dismiss the charges against him or, in the alternative, to suppress any evidence relating to the currency seized during his arrest, which the police department improperly deposited prior to trial, thereby violating his right to due process under article first, § 8, of the Connecticut constitution. Specifically, the defendant contends that the police department's improper disposition of the currency denied him an opportunity (1) to test the bills for the absence of Drobnak's fingerprints or DNA and (2) to demonstrate that the denominations on the inventory list were incorrect, that the currency was comprised of large bills, and that the actual denominations could have been used to impeach Drobnak's testimony regarding the transaction. Although we determine that the police department's disposition of the seized currency violated General Statutes § 54-36a (b) (3) (B),[9] we conclude that the defendant has failed to demonstrate a due process violation under article first, § 8, of our state constitution.

The following additional facts and procedural history are relevant to our resolution of this claim. After Griffin and Pelchat delivered the seized currency to the New London police station, Lynch and Pelchat each counted the bills and listed the total amount and denominations on a police department money envelope. The officers recorded that the total amount of money recovered was $1268, which consisted of two $50 bills, forty-eight $20 bills, twenty $10 bills, one $5 bill, and three $1 bills.[10]

On October 11, 2018, the defendant filed a motion for discovery requesting that the state produce, inter alia, "the actual money seized from [the defendant] on May 9, 2018 . . . for review and inspection by . . . [the defendant]." In its written response, the state replied that the "[police department's] policy for seized funds is to deposit such funds immediately in a secure bank account, not in evidence at the [police department]. . . . Accordingly, the state cannot produce the exact bills for the defendant's inspection." On January 3, 2018, the defendant moved to dismiss the charges, or, alternatively, to suppress any evidence concerning the seized cash arguing, inter alia, that the police department's failure to preserve potentially exculpatory evidence violated his right to due process under article first, § 8, of the Connecticut constitution as set forth in *State* v. *Morales*, 232 Conn. 707, 720–21, 657 A.2d 585 (1995). The state subsequently filed a response in opposition.

On February 27, 2019, the court heard argument on the defendant's motion. The defendant argued that the police department had violated § 54-36a (b) (3) (B) by failing to provide him with notice of his right to a hearing on the disposition of the seized currency before depos-

iting the currency into a secure bank account. He contended that the police department's failure to preserve the currency prevented him from testing the bills for Drobnak's fingerprints and DNA, and from determining their actual denominations, resulting in a violation of his state constitutional right to due process. The state conceded that the police department improperly had deposited the seized currency without providing the defendant notice, explaining that the police department had been using an outdated inventory form and that it was the department's standard procedure to deposit currency in a secure bank account. The state argued, however, that the currency's exculpatory value was speculative and that the defendant was not prejudiced by its inability to produce missing bills. The state also contended that the police department's failure to inform the defendant of his right to a hearing was not done in bad faith and, therefore, did not rise to the level of a constitutional violation.[11]

After hearing argument, the court orally denied the defendant's motion. In so doing, the court applied the four factor test set forth in *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), to determine whether the police department's failure to preserve the currency violated the defendant's state constitutional right to due process. Specifically, the court "consider[ed] the following factors . . . [1] the materiality of the potentially exculpatory evidence, [2] the likelihood of mistaken interpretation of the missing evidence by witnesses or the fact finder, [3] the reason for the unavailability of the evidence, and [4] the prejudice to the defendant." Applying each factor, the court held that (1) "the money [was not material because] . . . while it may be exculpatory, it could go both ways . . . . If [forensic testing] found [Drobnak's] fingerprints or DNA on the money that you held, it's going to support . . . Drobnak's potential testimony that he gave you the money for some drugs," (2) "regarding the likelihood of mistaken interpretation of missing evidence . . . I think it could be very well explained by . . . the state that this is per statute, even despite the fact that they didn't notify you," (3) "the reason for the unavailability of the evidence is that it was deposited wrongfully because you didn't get notice, but that wasn't bad faith," and (4) "to ensure that you're not prejudiced by [the missing currency] . . . I'm going to allow you full cross-examination to the police about why you weren't notified pursuant to the statute."

We begin our analysis by setting forth the appropriate standard of review and the relevant principles of law that govern the defendant's claim on appeal. "With respect to a due process violation for failure to preserve [potentially exculpatory evidence] under the federal constitution, the United States Supreme Court has held that the due process clause of the fourteenth amend-

ment requires that a criminal defendant . . . show bad faith on the part of the police [for] failure to preserve potentially useful evidence [to] constitute a denial of due process of law. . . .

"In . . . *Morales* . . . our Supreme Court rejected the federal bad faith requirement and instead held that, when a due process claim is advanced under the Connecticut constitution, our courts should employ the balancing test set forth in . . . *Asherman* . . . . In determining whether the reasons for the unavailability of the evidence outweigh the degree of prejudice to the accused, the *Asherman* test reviews the totality of the circumstances surrounding the missing evidence. . . . Specifically, the *Asherman* test considers [1] the materiality of the missing evidence, [2] the likelihood of mistaken interpretation of it by witnesses or the jury, [3] the reason for its unavailability to the defense and [4] the prejudice to the defendant caused by its unavailability . . . . The reason for the missing evidence's nonavailability factor concerns the state's involvement and the remaining three factors scrutinize the impact of the missing evidence on the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Fox*, 192 Conn. App. 221, 236–37, 217 A.3d 41, cert. denied, 333 Conn. 946, 219 A.3d 375 (2019).

Here, the trial court examined the underlying facts and determined that the unavailability of the seized currency did not violate the defendant's right to due process under our state constitution. "[W]hether those facts constituted a violation of the [defendant's right to due process] is a mixed determination of law and fact that requires the application of legal principles to the historical facts of the case. . . . Whether the historical facts as found by the [trial] court constituted a violation of the [defendant's right to due process] is subject to plenary review by this court, unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *State* v. *Nunez*, 93 Conn. App. 818, 823, 890 A.2d 636, cert. denied, 278 Conn. 914, 899 A.2d 621, cert. denied, 549 U.S. 906, 127 S. Ct. 236, 166 L. Ed. 2d 186 (2006). Applying the *Asherman* test to the present case, we conclude that the state's failure to preserve the seized currency did not violate the defendant's due process right under the Connecticut constitution.

The first *Asherman* factor involves the materiality of the missing evidence. In *State* v. *Asherman*, supra, 193 Conn. 695, our Supreme Court set forth the standard for materiality in cases where evidence was lost or destroyed prior to forensic testing. Specifically, the court held that "if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's

version of the facts, would prove exculpatory." (Internal quotation marks omitted.) Id., 725. Our courts subsequently have clarified that standard, explaining that "[missing] evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Fox*, supra, 192 Conn. App. 237; *State* v. *Estrella*, 277 Conn. 458, 485, 893 A.2d 348 (2006) (same).[12]

The defendant contends that, had the currency been available, he could have (1) tested it for the absence of Drobnak's DNA or fingerprints and (2) demonstrated that the currency denominations had been larger than those listed on the police department's envelope containing the seized currency, thereby negating Drobnak's account that he purchased crack cocaine from the defendant with two $20 bills and one $10 bill. We are not persuaded.

As an initial matter, the defendant has not established that forensic testing of the currency for DNA or fingerprints could have been performed and that those results would prove to be exculpatory under the circumstances of this case. Indeed, it is speculative whether forensic testing yielding cognizable fingerprints or DNA profiles could have been performed on the currency. The record indicates that Drobnak was in the Toyota operated by the defendant for less than one minute. The defendant has not presented evidence establishing that Drobnak was in possession of the bills for a substantial period of time before the alleged transaction or that Drobnak handled each bill individually. Therefore, it remains unclear whether a quick exchange of currency would have been sufficient for Drobnak to leave traceable fingerprints or DNA profiles on any or all of the bills. Moreover, given the frequency by which currency changes hands, and the fact that the bills were commingled when recovered during the arrest, the defendant has not demonstrated that the forensic lab would have been able to extract unique and discernable profiles from the bills.

The defendant argues that the speculative nature of such testing is irrelevant because he sought to establish the *absence*, rather than the *presence*, of Drobnak's DNA and fingerprints. Relying on the language set forth in *Asherman*, he claims that tests could have been performed and results obtained, which, whether inconclusive or affirmatively indicating the absence of Drobnak's fingerprints, would have proven exculpatory within his version of the facts. Stated otherwise, the defendant contends that the inability to isolate identifiable fingerprints or DNA on the currency would have supported his theory of defense, namely, that no transaction transpired between him and Drobnak at the Gulf station parking lot. However, even if we were to assume that forensic test results would have been inconclusive,

or that such results actually would indicate the absence of Drobnak's fingerprints or DNA, the defendant still cannot demonstrate a reasonable probability that the outcome at trial would have been different. As this court frequently has held, such results would not conclusively establish that Drobnak never handled the seized currency, but only that his DNA and fingerprints were not detectable. See *Jason B.* v. *Commissioner of Correction*, 141 Conn. App. 674, 678, 62 A.3d 1144, cert. denied, 308 Conn. 935, 66 A.3d 498 (2013); *Davis* v. *Commissioner of Correction*, 140 Conn. App. 597, 607–608, 59 A.3d 403, cert. denied, 308 Conn. 920, 62 A.3d 1133 (2013); *State* v. *Morales*, 39 Conn. App. 617, 623–24, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995).

In addition, there are "other facts" indicating that the test results in this case might have proved unfavorable to the defendant. *State* v. *Asherman*, supra, 193 Conn. 725. Drobnak testified that he provided the defendant with currency in exchange for narcotics. Likewise, the officers observed Drobnak in possession of the crack cocaine immediately after his encounter with the defendant in a location well-known for narcotics trafficking. Considered together, these facts suggest that the seized bills could have tested positive for Drobnak's DNA and/ or fingerprints, and, therefore, were as likely to be inculpatory as they were exculpatory. Indeed, had the test results returned positive for Drobnak's DNA or fingerprints, the defendant's theory of defense would have been severely undermined.

Finally, although the defendant repeatedly has argued that the seized currency was comprised of large bills, he has not provided any additional support for that contention. It is true that the defendant presented testimony at trial that detailed his alternative and legitimate sources of income. He has failed, however, to offer any evidence demonstrating that he received this income, or withdrew money, exclusively in large bills.[13] Accordingly, this claim is also speculative. In the absence of additional evidentiary support, the defendant cannot persuasively demonstrate that the ability to examine the currency prior to trial would have changed the outcome of the proceeding, especially in light of Pelchat's testimony regarding the denominations that were recorded on the police department's inventory envelope. We conclude, therefore, that the materiality of the missing currency weighs in favor of the state.

The second *Asherman* factor requires us to consider the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury. The defendant argues that the possibility of jury misinterpretation was substantial in this case because the testimony surrounding the currency denominations supported the inference that he was a narcotics dealer. Specifically, the state presented evidence that the seized currency was comprised of several small bills, which corroborated Drob-

nak's testimony that he provided the defendant with two $20 bills and one $10 bill in exchange for the crack cocaine. In the absence of the actual currency, the defendant argues that the jury was likely to misinterpret the evidence as supporting the state's version of the case.

This court, however, has held that "[m]istaken interpretation can be minimized at the trial by permitting testimony on the issue . . . ." (Internal quotation marks omitted.) *State* v. *Fox*, supra, 192 Conn. App. 240; see also *State* v. *Thompson*, 128 Conn. App. 296, 304, 17 A.3d 488 (2011), cert. denied, 303 Conn. 928, 36 A.3d 241 (2012). In the present case, the trial court allowed the defendant "full cross-examination" of the state's witnesses regarding why the seized currency was improperly deposited, the specific denominations, and the inability to test the currency for DNA and fingerprints. The defendant also testified that he had earned the money working as a greens mower and that the money seized was comprised exclusively of large bills. Moreover, although the court allowed the defendant considerable leeway to discuss the circumstances surrounding the missing currency, the defendant never requested an adverse inference instruction or a missing evidence instruction. See *State* v. *Barnes*, 127 Conn. App. 24, 33–34, 15 A.3d 170 (2011) (weighing mistaken interpretation prong in state's favor where defendant failed to request missing evidence instruction or adverse inference instruction), aff'd, 308 Conn. 38, 60 A.3d 256 (2013). Accordingly, the jury was presented with two different versions of the facts and was free to determine how much weight to afford each version. We conclude, therefore, that the likelihood of mistaken interpretation at trial was minimal.

The third *Asherman* factor concerns the reason for the nonavailability of the evidence. "In weighing the third *Asherman* factor . . . our cases have focused on the motives behind the destruction of the evidence. . . . In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 128 Conn. App. 304.

It is undisputed that the police department failed to notify the defendant of his right to a hearing on the disposition of the currency and the state concedes that the currency was improperly deposited into a secure bank account in violation of § 54-36a (b) (3) (B). The defendant argues that the police department's admitted mishandling of the currency weighs this factor in his favor. Conversely, the state argues that, in the absence

of a showing of bad faith or improper motive on the part of the police department, the factor should weigh in the state's favor.

In considering whether the state acted with improper motive, or in reckless disregard of the defendant's rights, we must examine the requirements of § 54-36a (b) (3) (B). Section 54-36a (b) (3) (B) provides in relevant part that "[i]f the seized property is currency and is not stolen property, *the law enforcement agency seizing the currency shall, within ten days of such seizure, notify the defendant . . . if such currency was seized in connection with a criminal arrest . . . that such defendant . . . has the right to a hearing before the Superior Court on the disposition of the currency.* Such defendant . . . may, not later than thirty days after receiving such notice, request a hearing before the Superior Court. The court may, after any such hearing, order that the law enforcement agency, after taking reasonable measures to preserve the evidentiary value of the currency, deposit the currency in a deposit account in the name of the law enforcement agency as custodian for evidentiary funds at a financial institution in this state or order, for good cause shown, that the currency be retained for a period to be determined by the court. If such defendant or person does not request a hearing, the law enforcement agency may, after taking reasonable measures to preserve the evidentiary value of the currency, deposit the currency in a deposit account in the name of the law enforcement agency as custodian for evidentiary funds at a financial institution in this state." (Emphasis added.)

It is clear from the plain language[14] of the statute that the legislature, in enacting § 54-36a (b) (3) (B), was particularly concerned with the preservation of currency by law enforcement in criminal proceedings and with providing individuals with the right to a hearing on the disposition of such currency. Indeed, subdivision (b) (3) was amended in 2001 specifically to provide a statutory right to notice of the opportunity to request a hearing before any currency is deposited. See Public Acts 2001, No. 01-104.[15]

Section 54-36a (b) (3) (B), therefore, required the police department to notify the defendant within ten days of May 9, 2018, the date of his arrest, of his right to a hearing on the disposition of the seized currency. During the pretrial hearing, however, the prosecutor indicated that the police department was using an outdated inventory form, which did not include the statutory mandate to inform criminal defendants of their right to a hearing on the disposition of seized currency. The prosecutor also indicated that it was the police department's standard "procedure at the time" to immediately deposit seized currency into a bank account. Such procedure clearly violates the requirements of § 54-36a (b) (3) (B) and deprives individuals, such as

the defendant, of their statutory right to notice of a hearing on the disposition of currency seized during an arrest. Indeed, the police department's "outdated" form and practices failed to reflect a statutory amendment passed in 2001 for the purpose of preserving evidence. See Public Acts 2001, No. 01-104. As such, the police department's procedure stood in direct violation of Connecticut law for more than seventeen years. Although the record does not reflect animus or improper motive on the part of the individual officers involved, it is clear that the police department's policy in this case constituted a reckless disregard of the defendant's rights. Accordingly, the reason for the unavailability of the evidence weighs in the defendant's favor.

The final *Asherman* factor involves the prejudice caused to the defendant as a result of the unavailability of the evidence. "In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." (Internal quotation marks omitted.) *State* v. *Morales*, 90 Conn. App. 82, 91, 876 A.2d 561, cert. denied, 275 Conn. 924, 883 A.2d 1250 (2005). Our review of the record leads us to conclude that the direct and circumstantial evidence presented by the state provided strong evidence of the defendant's guilt. At trial, the state offered Drobnak's testimony that he had purchased crack cocaine from the defendant and had done so on at least two prior occasions. This court previously has held that such eyewitness testimony can provide critical evidence in cases where other evidentiary sources are lost or missing. See *State* v. *Barnes*, supra, 127 Conn. App. 33–36. Moreover, Drobnak's account was corroborated by Lynch and Zelinski, both of whom observed Drobnak enter the Toyota operated by the defendant and testified to finding Drobnak in possession of narcotics immediately after he exited the vehicle. The officers also testified, in light of their training and experience, that the limited exchange between Drobnak and the defendant, which occurred in an area well-known for frequent drug sales, was behavior indicative of a narcotics transaction. In addition, Drobnak provided the officers with the cell phone number of the individual he had contacted to arrange the narcotics transaction, a number belonging to the phone Pelchat recovered from the center console of the defendant's vehicle. Finally, the defendant continued to operate the Toyota for two to four hundred feet after Moreau attempted to conduct a motor vehicle stop and the defendant stated "that's all I know" in response to Lynch's question regarding the defendant's involvement in narcotics trafficking.

By contrast, the defendant presented a largely unsubstantiated account of what transpired between himself and Drobnak during their brief interaction at the Gulf station. As discussed previously, the defendant could

not demonstrate the currency's exculpatory value beyond speculative assertions. Although the defendant did offer witness testimony that he had legitimate sources of income, he presented no evidence indicating that he was either paid in large bills or had withdrawn large bills from his bank account.

Finally, this court repeatedly has held that a trial court may ameliorate any prejudice resulting from unavailable evidence by providing the defendant with unfettered cross-examination and by allowing the defendant to focus on the state's failure to produce such evidence during closing argument. See id., 36 ("any potential prejudice from the loss of [evidence] was ameliorated by the court's allowing the defendant unfettered cross-examination [and] . . . allowing the defendant to use, during closing argument, the fact that the [evidence was] missing in an attempt to raise reasonable doubt in the mind of the jury"); see also *State* v. *Kelsey*, 93 Conn. App. 408, 422, 889 A.2d 855 ("the court ameliorated any potential prejudice to the defendant by allowing unfettered cross-examination of the state's witnesses regarding the loss of the evidence and in allowing his closing argument to focus on the state's failure to produce the requested items that were seized"), cert. denied, 277 Conn. 928, 895 A.2d 800 (2006).

In the present case, the trial court provided the defendant with a full opportunity to question the officers regarding the improper disposition of the currency and the accuracy of the denominations listed on the inventory list. He was also able to elicit inconsistencies in Drobnak's testimony, including his initial misidentification of the defendant. Similarly, the defendant provided his version of the facts on direct examination and argued that the currency's absence prejudiced him during closing argument. As a result, the defendant's narrative, the reasons for the currency's unavailability, and the prejudicial concerns stemming from the currency's unavailability were all before the jury for consideration. Accordingly, any prejudice to the defendant resulting from the missing currency was minimal. We conclude that the fourth *Asherman* factor weighs in favor of the state.

Considering the *Asherman* factors together, we conclude that the defendant was not deprived of his state constitutional right to due process. Although the police department's improper disposition of the currency demonstrated a reckless disregard of the defendant's statutory right to notice of a hearing on the currency's disposition under § 54-36a (b) (3) (B), we find that (1) the actual bills were immaterial because it is speculative whether the defendant's examination or testing of the currency would have led to exculpatory evidence that affected the outcome of the proceeding, (2) the currency's absence was unlikely to lead to misinterpretation of the evidence by the jury, and (3) considering the

strength of the state's case, as well as the defendant's opportunity to engage in unfettered cross-examination and to raise doubt about the significance of the seized currency during closing argument, the defendant was not prejudiced by the currency's unavailability. The defendant's due process claim, therefore, must fail.

II

The defendant's second claim is that the trial court abused its discretion by denying his postverdict motions for a new trial or, in the alternative, a mistrial based on the state's late disclosure of forensic lab photographs depicting the narcotics seized from Drobnak's vehicle on May 9, 2018. The defendant argues that the state's failure to timely disclose potentially exculpatory photographs violated his right to due process under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the defendant contends that the state's delayed disclosure resulted in prejudice because it prevented the defendant from (1) pursuing an alternative trial strategy and (2) accepting a favorable plea agreement rather than proceeding to trial. We are not persuaded.

The following additional facts and procedural history are relevant to our disposition of this claim. On August 2, 2018, the state provided the defendant with a copy of the state's forensic lab report (report), generated by Ellen Conlon, an analyst with the division of scientific services of the Department of Emergency Services and Public Protection (lab), after testing the narcotics seized from Drobnak's vehicle. In the section entitled "Description of Evidence Submitted," the report stated that the white, rock like substance was contained within "knotted plastic."

On September 20, 2018, the defendant filed a motion to suppress the currency and the phone seized during the defendant's arrest, as well as the defendant's statements made to law enforcement during the arrest, on the ground that the police lacked any legal authority to stop the defendant's vehicle. The court subsequently held a suppression hearing on October 4, 2018, during which Lynch testified that, at the time he approached Drobnak's vehicle, he observed Drobnak "poking at [a] white rock like substance" with the ink cartridge of a pen.

After the suppression hearing, the defendant noticed that the report's description indicating the presence of "knotted plastic" contradicted both Lynch's testimony and Drobnak's formal statement given to the police department that he had purchased "loose" crack cocaine from the defendant on May 9, 2018. The defendant subsequently argued that these discrepancies presented a chain of custody issue and requested that his standby counsel subpoena the lab for any photographs taken of the seized narcotics. In response to the defendant's

subpoena, the lab sent Mark Anderson, its chemistry department supervisor[16] and the technical reviewer[17] in the present case, to testify as to the report and photographs.

At trial, Lynch again testified that he found Drobnak poking at a white, rock like substance with the ink cartridge of a pen. Likewise, Drobnak reiterated that the narcotics were not wrapped in plastic at the time he purchased them, but rather were "handed to [him] loose."

On the second day of trial, the state called Anderson to testify as to the lab's procedures and the results obtained in the defendant's case. Anderson testified that he oversaw Conlon's performance and verified that the white, rock like substance tested positive for cocaine. During cross-examination, the defendant inquired as to whether lab employees took photographs of the narcotics when they were initially received by the lab. Anderson then produced two photographs depicting the narcotics, which were subsequently introduced together as a full exhibit. Anderson proceeded to testify that, on the basis of the photographs, the narcotics appeared to be contained within a knotted plastic bag and identified the location of the purported plastic within one of the photographs. He stated that he did not know who placed the narcotics in knotted plastic, but testified that the narcotics were in that condition when received by the lab.

At the beginning of the defendant's case-in-chief, the defendant called Zelinski to testify as to the condition of the narcotics when they were initially seized. Specifically, the defendant inquired whether Zelinski, as the officer who initially recovered the narcotics from Drobnak's Volvo, remembered whether the narcotics were wrapped in knotted plastic or whether he manipulated the narcotics in any way. Zelinski testified that the narcotics were "loose" when he first took possession of them and that he did not place them in a plastic bag.

After Zelinski's testimony, the defendant argued, outside the presence of the jury, that the inconsistent evidence regarding the knotted plastic presented a significant question regarding the chain of custody of the narcotics such that the test results of the narcotics should be excluded. The court agreed with the defendant's contention that "nobody testified that [the narcotics were] recovered in a knotted plastic bag, and none of the officers stated that they placed it in a plastic bag. . . . [S]omewhere along the line, somebody put the rock like substance in a knotted plastic bag inside the [evidence] envelope." The court stated, however, that, because the defendant presented the chain of custody issue "last minute," it was going to allow the state time to investigate the matter and provide an explanation for the inconsistency. The defendant subsequently moved for a judgment of acquittal based on the chain of custody issue. He also argued that it would be

improper for the state to present rebuttal witnesses after having rested its case-in-chief. The court disagreed and decided that it would delay its ruling on the defendant's motion until after the state had an opportunity to present its rebuttal.

On rebuttal, the state recalled Lynch to testify as to the chain of custody issue. Lynch testified that the narcotics were "loose" when seized, subsequently packaged only in an official evidence bag, and then transferred to the police department's evidence officer, John Green. On cross-examination, Lynch testified that he would have documented the presence of knotted plastic, had the narcotics been seized in that condition. When shown the forensic lab photographs, Lynch stated that he was unsure whether the photographs depicted knotted plastic, but agreed that the presence of knotted plastic would contradict the manner in which he preserved the narcotics.

The state then called Green to testify as to the condition of the narcotics both before the narcotics were transferred from the police department to the lab and after the lab returned the narcotics to the police department. Green testified that the cocaine was not contained within knotted plastic when he originally received it from Lynch. He testified further that, after receiving the narcotics, he completed a request for analysis form before the narcotics were "sealed [and] transported to the lab."

Green proceeded to testify that, upon submitting the narcotics, he was given a written receipt from the lab (submission receipt). He testified that neither the request for analysis form he completed nor the submission receipt indicated the presence of a knotted plastic bag. Green also testified that the lab provided an additional receipt upon returning the narcotics to the police department (return receipt). Although the return receipt contained an itemized line listing "[r]ock-like material in knotted plastic," a handwritten notation indicated that the knotted plastic was "not applicable." When shown the forensic lab photographs of the narcotics, Green stated that he did not believe the photographs depicted a knotted plastic bag.

At the conclusion of Green's testimony, the state informed the court that it did not intend to call additional rebuttal witnesses on the chain of custody issue. Regarding the defendant's motion for a judgment of acquittal, the state argued that the conflicting testimony surrounding the knotted plastic bag was an issue for the jury to resolve. In response, the defendant requested additional testimony from lab employees to clarify "the condition they received [the narcotics] in" and explain the significance behind the "not applicable" notation on the return receipt.

The trial court subsequently denied the defendant's

motion for a judgment of acquittal, concluding that, "[u]ltimately it's up to the jury to decide whether or not [the narcotics are] in a knotted plastic bag or not, and that will determine what their verdict may be. And it's something [the defendant] could discuss on closing argument." Afterward, the defendant renewed his request to call additional lab employees as witnesses. The court stated that it was "a little late [to] subpoena" lab employees, but asked the state to contact the lab and produce any representatives who could explain "what was actually received and what was returned."

The next morning, the state informed the court that it was prepared to present testimony from Anderson and Conlon, the analyst who performed the forensic testing in the defendant's case and took the photographs in question. Before Anderson and Conlon took the stand, the defendant requested to speak with either witness regarding any evidence he or she intended to offer. The court denied the defendant's request, explaining that Anderson and Conlon were the state's witnesses, that it was still the state's case on rebuttal, and that the defendant would have an opportunity to question them on the stand.

Anderson testified that, as a technical reviewer, he was not responsible for personally examining the narcotics in this case. Rather, his role involved reviewing photographs and notes from the case file before ultimately approving the forensic report. He clarified that, based on his view of the photographs taken by Conlon, he had originally believed that the narcotics were wrapped in a knotted plastic bag. Anderson proceeded to testify, however, that he later had an opportunity to enlarge and review one of the photographs. He explained that "[l]ooking at the zoomed-in photograph, it looks like . . . what I thought was the end piece of some plastic was probably glare now after I blew it up, and I can't definitively say if there's a knotted piece of plastic there or not." The court admitted the enlarged photograph as a full exhibit over the defendant's objection.

The state then called Conlon as a witness, who testified that, when she prepared the report in the defendant's case, she was working off the photographs she had taken of the narcotics as opposed to the actual narcotics.[18] She stated that the original photograph had led her to believe that the narcotics were contained within a knotted plastic bag. Upon viewing the enlarged photograph, Conlon testified that "there's no question it's—it certainly looks like a reflection here. . . . It means there was not a piece of plastic in that. . . . I looked at this and saw a piece of plastic, and obviously there wasn't one." The defendant was given a full opportunity to cross-examine both Anderson and Conlon regarding the discrepancies between the report, the original photograph, and the enlarged photograph.

After the jury returned its verdict, the defendant filed

a series of postverdict motions, seeking either a new trial or a mistrial.[19] The defendant's motions claimed, inter alia, that the state had violated his right to due process under *Brady* v. *Maryland*, supra, 373 U.S. 87, by failing to timely disclose the forensic lab photographs. Specifically, the defendant argued that the report's description of "knotted plastic" caused him to pursue a trial strategy based on the chain of custody. He contended that, had the photographs been disclosed earlier, he would have pursued alternative trial strategies[20] or reserved his chain of custody theory for closing argument. In response to the defendant's motions, the state argued that it had timely disclosed the report, that it was not in possession of the forensic lab photographs until the defendant subpoenaed them during trial, and that the actual narcotics were made available to the defendant before the start of trial.

On July 8, 2019, the court heard argument on the defendant's postverdict motions. In an oral ruling, the court held that the defendant had failed to establish a *Brady* violation. The court explained that "[the defendant] could've called for further witnesses to testify after it was established that the picture or the lab report was in error regarding the knotted plastic bag—there was a flash or something, some kind of shiny object that appeared in the initial photograph that made it look like it possibly could've been the knotted plastic bag, but again, both parties, as well as the court, saw that it—in fact, it was a flash; some kind of shiny object made it appear that way. . . . [T]he evidence is not exculpatory; in fact, it's inculpatory." The court subsequently denied each of the defendant's motions.

On appeal, the defendant claims that the trial court abused its discretion by denying his postverdict motions for a new trial or, in the alternative, a mistrial because the state's failure to timely disclose the forensic lab photographs violated his right to due process under *Brady*. The defendant further argues that the delayed disclosure resulted in prejudice by causing the defendant to (1) forgo alternative trial strategies and (2) reject a favorable plea agreement. We are not persuaded.

We begin by setting forth the appropriate standard of review and relevant principles of law that guide our resolution of the defendant's claim on appeal. "In *Brady* . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. . . . [T]he *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . In order to prove a *Brady* violation, the defendant must show:

(1) that the prosecution suppressed evidence after a request by the defense; (2) that the suppressed evidence was favorable to the defense; and (3) that the evidence was material. . . .

"[E]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Even if evidence is not deemed suppressed under *Brady* because it is disclosed during trial, however, the defendant nevertheless may be prejudiced if he is unable to use the evidence because of the late disclosure. . . . Under these circumstances, the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time. . . . Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Citation omitted; internal quotation marks omitted.) *State* v. *Washington*, 155 Conn. App. 582, 596–97, 110 A.3d 493 (2015).

In the present case, we need not reach the issue of whether the state's delayed disclosure prejudiced the defendant because the defendant cannot demonstrate that the forensic lab photographs were favorable to his defense. See *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507 ("[i]f . . . the petitioner has failed to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred"), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). Although there was confusion at trial regarding the presence of a knotted plastic bag, the enlarged photograph clearly demonstrated that, what originally appeared to be knotted plastic, was actually glare or reflection from Conlon's camera. Indeed, the defendant conceded during the posttrial hearing on his motions that "[t]here's no denying that there is no knotted plastic bag inside of that container." Because the photographs did not depict knotted plastic, they were not favorable to the defendant because they did not support his challenge to the chain of custody. See *State* v. *Gradzik*, 193 Conn. 35, 40–41, 475 A.2d 269 (1984) (finding no *Brady* violation where suppressed testimony was not exculpatory).[21] We conclude, therefore, that the defendant has failed to demonstrate a due process violation under *Brady*. Accordingly, the trial court did not abuse its discretion by denying the defendant's postverdict motions for a new trial or, in the alternative, a mistrial.

### III

The defendant's final claim is that the court abused its discretion by permitting the state to present the enlarged lab photograph and related witness testimony on rebuttal. Specifically, the defendant argues that the court improperly (1) allowed the state to reopen its case-in-chief after the defendant moved for a judgment

of acquittal, (2) admitted evidence on rebuttal that did not contradict the defendant's case-in-chief, and (3) denied the defendant's request to review the enlarged photograph prior to Anderson's and Conlon's testimony. He contends that these errors were harmful because they resulted in the "collapse" of his trial strategy. We conclude, however, that the defendant invited any error that may have arisen from the court's decision to permit such evidence. Accordingly, the defendant's claim is unreviewable.

"[T]his court routinely has held that it will not afford review of claims of error when they have been induced. . . . As we previously have explained, the term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the [alleged] erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error and induced constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party." (Citations omitted; internal quotation marks omitted.) *State* v. *Martone*, 160 Conn. App. 315, 328, 125 A.3d 590, cert. denied, 320 Conn. 904, 127 A.3d 187 (2015).

On rebuttal, the state initially presented testimony from Lynch and Green. Both witnesses testified as to the condition of the narcotics before and after the narcotics had been tested by the lab, and offered their opinion on the presence of plastic in the original lab photographs. Upon the conclusion of Green's testimony, the state informed the court that it did not intend to call additional witnesses on the chain of custody issue. The state argued that the inconsistent testimony regarding the presence of knotted plastic was a matter to be resolved by the jury. The court agreed and subsequently denied the defendant's motion for a judgment of acquittal.

Although the defendant initially argued against the state's introduction of witness testimony on rebuttal, he repeatedly asked to call additional lab employees to testify as to the report, the return receipt, and the forensic lab photographs after the court denied his motion for a judgment of acquittal. Specifically, the defendant stated that "I'd like, I guess, [to] call somebody from the lab . . . back down here and then say if this is the condition they received it in" and "I want somebody from the lab or whoever took the photos . . . ." The court denied the defendant's request to subpoena additional witnesses, but asked the state to contact the lab and produce employees that could clarify the documents and the photographs. Only thereafter did Anderson and Conlon examine the enlarged photograph and testify that, what originally appeared to be knotted plas-

tic, was actually glare or reflected light.[22] As a result, the defendant invited the exact testimony he now complains undermined his defense. Further, the defendant was given a full and fair opportunity to cross-examine both Anderson and Conlon regarding the condition in which the lab received the narcotics and to elicit testimony regarding alleged discrepancies. We therefore decline to review his claim.

The judgment is affirmed.

In this opinion MOLL, J., concurred.

[1] At the time, each officer held the title of investigator and was assigned to the vice and narcotics unit of the police department. Vice and narcotics investigators are charged with investigating and arresting individuals that use, possess, and sell narcotics. Because anonymity is necessary to conduct undercover investigations and ensure officer safety, vice and narcotics officers frequently wear plain clothes and utilize unmarked vehicles.

[2] Upon entering the Gulf station parking lot, Lynch was able to observe, and later identify, the defendant as the operator of the Toyota.

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Griffin testified that it is against the police department's policy to initiate a motor vehicle stop in an unmarked vehicle.

[5] The defendant would later claim, first on October 4, 2018, during a hearing on the defendant's motion to suppress, and then later at trial, that the LG phone belonged to his son.

[6] At trial, Griffin and Pelchat testified that vice and narcotics officers typically do not park their unmarked vehicles near marked police cruisers. This is done to preserve the anonymity of the unmarked vehicle.

[7] The substitute information also included a part B information, which charged the defendant with having previously been convicted of possession of narcotics with intent to sell in violation of § 21a-277 (a). On April 8, 2019, the defendant waived his right to a trial on the charge contained in the part B information and admitted to the prior conviction.

[8] The jury did not return a verdict on the lesser included charge of possession of narcotics, and the state entered a nolle prosequi as to that charge.

[9] General Statutes § 54-36a (b) (3) (B) provides in relevant part that "[i]f the seized property is currency and is not stolen property, the law enforcement agency seizing the currency shall, within ten days of such seizure, notify the defendant . . . if such currency was seized in connection with a criminal arrest . . . that such defendant . . . has the right to a hearing before the Superior Court on the disposition of the currency. Such defendant . . . may, not later than thirty days after receiving such notice, request a hearing before the Superior Court. The court may, after any such hearing, order that the law enforcement agency, after taking reasonable measures to preserve the evidentiary value of the currency, deposit the currency in a deposit account in the name of the law enforcement agency as custodian for evidentiary funds at a financial institution in this state or order, for good cause shown, that the currency be retained for a period to be determined by the court. . . ."

[10] A photograph of the police department's money envelope reflecting these denominations was admitted into evidence at trial.

[11] We note that the state's argument rested upon an incorrect understanding of the law. Although the United States Supreme Court has held that a criminal defendant cannot demonstrate a federal due process violation, based upon the failure of the police to preserve potentially exculpatory evidence, in the absence of a showing of bad faith on the part of the police; see *Arizona* v. *Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); our Supreme Court unequivocally has rejected that standard. *State* v. *Morales*, supra, 232 Conn. 726–27. Rather, our state constitution requires that trial courts employ the balancing test set forth in *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), in determining whether the failure of police to preserve potentially exculpatory evidence constitutes a violation of the defendant's right to due process. Id.

[12] In *Correia* v. *Rowland*, 263 Conn. 453, 476–77, 820 A.2d 1009 (2003), our Supreme Court rejected the argument that unpreserved, untested evidence is exculpatory per se. The court stated that adopting such a presumption

"would stand in violent contradiction of the balancing principles espoused by the *Asherman/Morales* rule; by virtue of the fact that the evidence at issue is unpreserved and untested, the state could never rebut that presumption, despite the strength of its case as a result of other evidence." Id., 476–77. Accordingly, a defendant is not entitled to a presumption that the currency was exculpatory merely because it was lost prior to forensic testing. Rather, in such instances, the defendant must affirmatively demonstrate that such testing "*could . . . [be] performed*" and results obtained that "*would prove exculpatory.*" (Emphasis added; internal quotation marks omitted). *State* v. *Asherman*, supra, 193 Conn. 725.

[13] At trial, the defendant presented testimony from Adam Stewart, the defendant's supervisor at the Lake of Isles golf course in North Stonington, where the defendant was employed for nineteen days, specifically, April 9 through April 28, 2018. Stewart testified that the defendant worked full-time as a greens mower during that period and was paid biweekly by either direct deposit or live check. We note that Stewart's testimony regarding the form of payment fails to support the defendant's contention that he was paid in large bills. The defendant also introduced testimony from Attorney Shawn Sims as a representative of the Department of Revenue Services. Sims testified that the defendant was, "at some point . . . issued a cigarette [vendor's] license." Similarly, although the defendant claimed to have earned additional income from the lawful sale of cigarettes, he did not introduce any evidence of sales transactions or proceeds from the alleged sales.

[14] "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Onofrio* v. *Mineri*, 207 Conn. App. 630, 645–46, 263 A.3d 857 (2021).

[15] Prior to the 2001 amendment, subdivision (b) (3) read: "If the seized property is currency, the law enforcement agency seizing the property may deposit the currency in a safe deposit box in a financial institution in this state. No funds may be removed from such safe deposit box unless ordered by the court. The financial institution at which the safe deposit box is located shall not be responsible for monitoring activity in the safe deposit box or insuring that the contents of the safe deposit box are removed in accordance with the requirements of this subdivision." General Statutes (Rev. to 1999) § 54-36a (b) (3) (B), as amended by Public Acts 1999, No. 99-247, § 5.

[16] The chemistry department tests evidence for the presence of controlled drugs and narcotics. Members of the department also produce forensic reports and testify at trials, when necessary.

[17] The technical reviewer performs a supervisory role, evaluating work performed by analysts in a given case. Technical reviewers must examine the relevant data and agree with the analyst's conclusions before the analyst is permitted to release a formal report.

[18] Conlon testified that her typical procedure upon receiving evidence involved checking the evidence for discrepancies between the physical item and the police report, photographing the evidence, and re-sealing the evidence before performing an analysis and preparing a report.

[19] The defendant filed a motion entitled "Defendant's Motion for New Trial or Alternatively Declare a Mistrial," dated April 8, 2019. The defendant subsequently filed a "Supplement to Defendant's Motion for New Trial or Alternatively Declare a Mistrial" dated May 9, 2019, and an "Amendment to Defendant's Motion for New Trial or Alternatively Declare a Mistrial Dated April 8, 2019" dated June 3, 2019. The defendant also filed a motion entitled "Defendant's Motion for New Trial for State's Failure to Provide *Brady* Material," dated April 10, 2019. Each of these motions alleged, inter alia, that the state had failed to timely disclose the forensic lab photographs in

violation of *Brady*.

[20] Specifically, the defendant claimed that he would have argued that his arrest was the result of a targeted investigation coordinated by Zelinski and presented evidence attacking Zelinski's credibility.

[21] In his reply brief to this court, the defendant argues that the forensic lab photographs were exculpatory by drawing a distinction between the original and enlarged photographs. Specifically, the defendant claims that the original, unenlarged photographs were exculpatory because they purported to show the narcotics wrapped in a knotted plastic bag. He contends that had the photographs been timely disclosed, and had he learned that the enlarged photograph demonstrated the absence of knotted plastic, he would have attempted to introduce only the original photographs at trial. The defendant cites no authority standing for the proposition that the state must provide criminal defendants with neutral or inculpatory evidence so that the defendant can subsequently misrepresent that evidence as exculpatory at trial. See *Morant* v. *Commissioner of Correction*, supra, 117 Conn. App. 286 ("[o]ne does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). We conclude, therefore, that the defendant's argument is without merit.

[22] Although the defendant initially objected to the introduction of the enlarged photograph, his theory of objection was that the photograph was not authenticated, and not that the photograph was unduly prejudicial. After having an opportunity to examine the photograph, the defendant stipulated that the enlarged photograph was, in fact, a magnified version of the original. "Our Supreme Court has explained that, to afford [defendants] on appeal an opportunity to raise different theories of objection would amount to ambush of the trial court because, [h]ad specific objections been made at trial, the court would have had the opportunity to . . . respond." (Internal quotation marks omitted.) *State* v. *Chiclana*, 149 Conn. App. 130, 141, 85 A.3d 1251, cert. denied, 311 Conn. 950, 90 A.3d 977 (2014). Because the defendant failed to object on the ground that the enlarged photograph was unduly prejudicial, we conclude that his claim is not reviewable.